**ORIGINAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR 1 7 2009
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| MARTIN CONSTRUCTION, INC., | ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 09-236 C ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiff, Martin Construction, Inc., by the undersigned counsel, for its Complaint against the United States of America alleges as follows:

1. Plaintiff, Martin Construction, Inc., ("Martin"), is a corporation duly organized pursuant to the laws of the state of North Dakota with its principal place of business in Gladstone, North Dakota.

2. Defendant is the United States of America, acting by and through the Omaha District of the U. S. Army Corps of Engineers.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601 et seq. This action is a timely appeal pursuant to the CDA and the Contracting Officer's final decision dated January 13, 2009.

4. This action seeks the conversion of a termination for default on a construction contract to a termination for convenience, and a judgment for damages sustained by Martin due to the Corps' wrongful default termination.

5. The Defendant, acting through the Omaha District, (the "District"), of the U. S. Army Corps of Engineers, (the "Corps"), issued Solicitation No. W9128F-07-B-0018 for the

construction of a project referred to as the Fort Stevenson Marina, Garrison, North Dakota. The solicitation was issued on July 9, 2007.

6. The Defendant solicited sealed bids for a firm fixed-price unit price contract.

7. The project involved the construction of a marina, concession building, parking lot and certain related mechanical and electrical appurtenances at Lake Sakakawea.

8. The specifications for the concession building were defective in that they set forth performance criteria for the building but the Corps, after contract formation, demanded detailed design of the building and thereby delayed construction.

9. The specifications for the parking lot were defective in that they required Martin to construct a base and subbase for the parking lot out of Class 13 materials, but the Corps deleted 97% of the Class 13 material and directed utilization of Class 5 material for which there was no unit price bid. As a result Martin did not receive payment for the Class 5 material and the labor to install it, even though the cost exceeded $400,000. Furthermore, the Corps allowed no additional time for this work or for the pavement option.

10. Lake Sakakawea is a man-made reservoir created by the impoundment of the Missouri River behind the Garrison Dam.

11. The Garrison Dam is a multi-purpose structure operated by the Corps for recreation, fish and wildlife enhancement, flood control, hydropower production, navigation and irrigation.

12. In order to satisfy the multiple purposes of the dam, the Corps controls the elevation of the water impounded in the Lake Sakakawea reservoir by opening and closing the control gates on the structure.

13. The Corps also controls the flow of water into Lake Sakakawea by operation of the Fort Peck Dam, another multi-purpose structure located upstream on the Missouri River near Glasgow, Montana.

14. The marina was to be constructed by the enlargement and deepening of a small cove formed by the inflow of Lake Sakakawea into a natural depression along the shoreline of the reservoir in Fort Stevenson State Park.

15. Construction of the marina basin pursuant to the contract specifications required the construction of a cofferdam structure, the purpose of which was to restrain the Sakakawea Reservoir at an elevation of 1813 feet. The cofferdam was intended to prevent the water in Lake Sakakawea from entering the marina basin construction area. Two portions of the cofferdam, referred to as the north and south abutments, were to remain as permanent fixtures of the marina. The center section of the cofferdam was to be removed after completion of the marina to create an entrance channel for boats.

16. The specifications provided that excavation of the marina basin was to be performed with conventional earthmoving equipment working "in the dry."

17. The plans in the solicitation provided the details of the earthfill cofferdam, setting forth precise measurements, materials, tests, sequences for construction, and other specific technical information.

18. The first phase of the cofferdam consisted of an underwater fill to elevation 1815 feet. After dewatering of the cove area, the next phase of the cofferdam was to be constructed by fill placed "in the dry" to elevation 1825 feet. Excavation of the marina basin to elevation 1790 feet was also to be performed in the dry. The center section of the cofferdam was to be removed by land based equipment working in the dry from the north and south abutments.

19. On or about August 1, 2007, representatives of Martin conducted an onsite visit with Corps personnel.

20. The solicitation package included logs of borings taken in the general vicinity of the cofferdam. Based on information and belief, the Corps took the borings by drilling from the ice-covered surface of Lake Sakakawea in winter.

21. None of the borings were located in the footprint of the cofferdam.

22. Martin prepared its bid based on the plans and specifications provided in the solicitation, the amendments to the solicitation, its site inspection, and the other representations provided by the Corps concerning the site. None of the information available in the solicitation, or observable during the site inspection, alerted Martin to the possibility that the Corps' design was defective.

23. Following the opening of sealed bids, the Corps awarded Contract No. W9128F-07-C-0026 for the construction of the Fort Stevenson Marina to Martin on August 30, 2007. The contract award price was $6,997,859.74.

24. On September 19, 2007, the Corps issued the Notice to Proceed. Based on the required contract period of performance of 365 days, the contract completion date was September 30, 2008.

25. Delays were experienced in the performance of critical work activities that were beyond the control of, and without the fault or negligence of, Martin and its subcontractors. These excusable delays were caused by defective design, defective specifications, differing site conditions, government directed and constructive changes, adverse weather, the failure of the Corps to cooperate, and the active interference by the Corps.

26. On or about November 18, 2007, Martin mobilized to the project site to commence construction.

27. Performance of the largest critical work activity, excavation of the marina basin, was dependent on the second critical element of the construction sequence, dewatering of the site.

28. Dewatering of the site was dependent on construction of a functioning cofferdam to prevent the water from Lake Sakakawea from entering the work site and to protect laborers and equipment during contract performance.

29. Construction of the cofferdam, dewatering of the site, and excavation of the marina basin were all activities on the critical path of the project schedule.

30. On or about December 6, 2007, Martin commenced placement of the underwater fill to construct the Phase I cofferdam.

31. On or about 26 December, 2007, Martin completed placement of the underwater fill to the specifications of 2 feet above reservoir level and suspended work on the cofferdam

32. Martin collected and hauled field stone that was to be used for riprap to the staging area next to the marina area between December 5, 2007 and March 11, 2006. The Corps directed Martin to use half of this material to construct and protect the abutments and cofferdam. The Corps did not reimburse Martin for this extra work, nor did the Corps extend the time of performance for obtaining replacement rock.

33. Between April 14, 2008 and May 1, 2008, Martin attempted to dewater the marina side of the Phase I cofferdam without success.

34. On May 6, 2008, the Corps directed three changes to the cofferdam design in an attempt to increase the cofferdam's ability to restrain the flow of water entering the project site.

35. Between May 9, 2008 and May 22, 2008, Martin, in accordance with the Corps' directive, placed uncompacted clay in a wedge on the marina side of the cofferdam and into the water flowing through the cofferdam.

36. Even with the clay wedge placed on the marina side of the cofferdam, dewatering efforts could not lower the water level below the then current elevation of the reservoir, elevation 1807 feet, and neither excavation nor Phase II construction of the cofferdam could proceed as planned and as detailed in the contract specifications.

37. Based upon information and belief, the Corps learned on or about June 1, 2008 that the water level in Lake Sakakawea was forecast to rise from elevation 1812 feet to 1825 feet by July 10, 2008.

38. On June 9, 2008, the Corps directed Martin to raise the Phase I cofferdam to elevation 1825 feet without completing the contract specified dewatering operation.

39. As Martin continued to attempt to dewater the marina side of the cofferdam, a number of slope failures on the cofferdam sideslopes were observed and repaired.

40. In late June, 2008, Martin increased its dewatering pump capacity in an effort to overcome the rising hydraulic head caused by the rise in the water level of Lake Sakakawea to elevation 1819.2 feet.

41. On June 30, 2008, a large seepage boil developed on the marina side of the cofferdam approximately 25 feet from the toe of the cofferdam embankment.

42. When notified of the boil, the Corps directed Martin to cease all dewatering operations.

43. In July, 2008, the Corps directed Martin to double the footprint of the cofferdam; to reinforce numerous sideslope failures on the marina side of the cofferdam; and, to increase the elevation of the cofferdam.

44. On July 2, 2008, Martin notified the Corps that the cofferdam design and the specifications were defective and requested the Corps to furnish a revised design to correct the deficiencies, as well as to accommodate the unanticipated increase in the height of the cofferdam.

45. On July 2, 2008, Martin notified the Corps that the cofferdam, as originally designed and constructed as per the directives issued by the Corps, posed an extreme safety hazard to the laborers and equipment in the worksite. Martin further notified the Corps that the condition of the cofferdam made timely completion of the project impossible.

46. In order to increase the cofferdam footprint, Martin was required to remove portions of the north embankment that had been placed in accordance with the contract and had been tested for acceptance.

47. On July 3, 2008, Martin notified the Corps that the conditions of the cofferdam foundation constituted a differing site condition.

48. On or about July 9, 2008, Martin, while implementing the Corps direction to enlarge the footprint of the cofferdam observed that a large mud wave, a significant displacement of saturated material, was forming on the marina side of the cofferdam.

49. On July 10, 2008, the Corps directed Martin to place underwater fill on the marina side of the cofferdam.

50. On July 11, 2008, the Corps directed Martin to place a windrow of field stone and organic material on top of the cofferdam to elevation 1827 feet.

51. After the underwater fill failed to stabilize the mud wave, the Corps directed Martin to place and mechanically drive additional field stone mixed with organic material into the mud wave area to form a foundation for the cofferdam and abutments that was not shown on the contract drawings.

52. The stone material that the Corps directed Martin to use was approximately 50% of the rock material that had been stockpiled for use as rip rap on the completed embankment.

53. On July 11, 2008, Martin notified the Corps that the additional work directed by the Corps to stabilize the cofferdam entailed increased risk and would delay project performance because of the double handling of materials, changes in equipment, changes in methods and means of construction, diversion and consumption of stockpiled materials, and the inefficiency of working in a confined area. Martin indicated that these impacts would result in a drastic increase in the time required to complete the project.

54. On or about July 11, 2008, Martin notified the Corps that the reduced freeboard of the cofferdam increased the risk of overtopping as the water level in Lake Sakakawea increased.

55. On July 15, 2008, the Corps directed Martin to raise the crest of the cofferdam to elevation 1830 feet.

56. On July 17, 2008, Martin notified the Corps that the defective design of the cofferdam rendered the proposed increase in the height of the cofferdam an unreasonable safety risk on the working conditions in the marina worksite.

57. On July 18, 2008, a 200 foot long transverse crack eight feet deep was observed in the marina side of the cofferdam. The Corps ordered Martin to stop all construction work on the cofferdam and abutment embankments.

58. On July 30, 2008, the Corps established a "no cross" line that limited all excavation and fill operations to the east side of the work site.

59. The limitation of operations to the east side of the work site prevented orderly performance of the critical work activities because it lengthened haul road distances, forced inefficient and illogical construction sequences, and substantially decreased the area available for the maneuvering of equipment. The "no cross" line impacted the performance of contract work beginning on July 18, 2008.

60. On August 1, 2008, Martin notified the Corps that it could not proceed with cofferdam or abutment construction without a workable redesign.

61. On August 1, 2008, while disregarding the myriad of directed changes to the work issued between May 6, 2008 and August 1, 2008, the Corps notified Martin that it was behind schedule and that it would commence withholding ten percent of each progress payment.

62. On August 4, 2008, Martin notified the Corps that its progress was continuing to be delayed due to the lack of a workable comprehensive redesign of the marina.

63. On August 19, 2008, the Corps, without sufficient justification, issued an interim unsatisfactory performance appraisal, essentially asserting that Martin was behind schedule, but without giving appropriate and due consideration to the excusable nature of the government-caused project delay.

64. On September 5, 2008, the Corps issued a "show cause" letter offering Martin the opportunity to explain why the contract should not be terminated for default for failure to make progress. The Corps asserted that Martin would not meet the contract completion date of October 6, 2008. The Corps also alleged that Martin's failure to proceed with work west of the

9

"no cross" line and lack of a project schedule endangered completion of the project before winter.

65. Concurrent with the issuance of the "show cause" letter on September 5, 2008, the Corps issued a new cofferdam design, directed the construction of rock-filled trench drains, and issued a new design and construction procedure for the south abutment and retained an engineering firm to conduct an elaborate on-site sub-surface investigation, in-sittu testing and geotechnical analysis of the cofferdam.

66. On September 12, 2008, Martin responded to the "show cause" letter, listing 26 actions or omissions by the Corps that were unforeseeable and excusable causes of delay beyond the control of and without the fault or negligence of Martin.

67. On September 16, 2008, the Contracting Officer responded to Martin's detailed explanation of why it was not at fault for the delays to the project by defensively and summarily choosing to characterize Martin's response as "accusational," but failing and refusing to address the merits of Martin's position. This brief and superficial response to Martin's detailed listing of serious acts and omissions by the Corps demonstrates the arbitrary and capricious nature of the termination for default that is at the heart of this appeal.

68. On September 18, 2008, the Corps directed Martin to accelerate performance by increasing its equipment and instituting weekend work.

69. On September 28, 2008, the Corps lifted the "no cross" line that had limited the work area to the eastern side of the project.

70. In mid to late October, 2008, the Corps issued additional changes in the cofferdam and abutments that required Martin to perform extra work.

71. On November 3, 2008, Martin notified the Corps that it could not perform the additional work until it obtained additional quantities of rock.

72. On November 19, 2008, Martin submitted six claims for additional work performed between May 6, 2008 and November 2, 2008 that increased the time of performance.

73. In late November and early December, 2008, the Corps issued revised grading and sideslope plans.

74. On December 1, 2008, Martin attempted to excavate material on the north abutment, but the embankment gave way and failed. Due to the instability of the embankment the Corps suspended work on the north abutment until December 8, 2008.

75. Beginning on December 2, 2008, and continuing through January 13, 2009, the ambient temperatures at the site were substantially below the temperature restrictions on grading in the specifications.

76. On December 4, 2008, the Corps designated a new "no cross" line and instituted time-controlled excavation and embankment placement rates based on additional geotechnical testing and analysis. The time controlled rates were not part of the original specifications.

77. On December 8, 2008, the Corps notified Martin that further excavation in the marina basin could not be performed safely in the dry.

78. On December 9, 2008, the Corps informed Martin that the excavation of the marina basin was to be performed underwater using dredges and barges, that Martin was not considered as qualified to perform the work using that method, and that Martin's proposal to perform the new method of work using a specialty subcontractor was rejected.

79. On December 31, 2008, Martin submitted three additional claims for additional work performed between May 6, 2008 and November 2, 2008 that supported an increase in the time of project performance.

80. On January 13, 2009, the Corps terminated the contract for default. In the Final Decision, the Contracting Officer wrongfully determined that the failure to meet the contractual completion date of October 11, 2008, and any subsequent projected dates, was inexcusable. The Contracting Officer summarily stated that "construction needed to be substantially complete before harsh winter weather arrived." The Contracting Officer also summarily stated that "The severe weather experienced in North Dakota over the past several weeks was not a factor in this determination."

81. As of the date of termination, Martin was entitled to substantial extensions of the contract performance time to at least June, 2009. The Corps, through contract modifications, had granted time extensions amounting to only 21 days and had only extended the contract completion date to October 11, 2008.

82. As of the date of termination, Martin's failure to proceed with the contract work was the result of government-cause delays, was beyond its control, and was without fault on the part of Martin or its subcontractors.

83. As of the date of termination, the materials in the worksite continued to be too cold to allow the performance of grading as specified in the contract.

84. As of the date of termination, Martin was not in breach of its contract.

85. As of the date of termination, Martin was not in anticipatory breach of its contract.

86. As of the date of termination, Martin was willing and ready to do everything possible to overcome the government's defective design, defective specifications, and the differing site conditions and to perform the remaining contract work.

87. Martin submitted claims pursuant to the provisions of the contract requesting additional money and time to compensate it for the impact of defective design, defective specifications, differing site conditions, government directed suspensions of work, and government directed changes, all of which were ignored by the Defendant.

88. The Corps, acting unreasonably and without just cause, arbitrarily and capriciously terminated the contract for default knowing that the field conditions that were not the fault or responsibility of Martin and that those conditions made contract performance impractical, if not impossible.

89. The termination for default failed to give due consideration to the defective design, defective specifications, differing site conditions, excusable causes of delay, and further failed to give due consideration to the adverse impact on Martin's performance that resulted from factors that were the fault and responsibility of the Corps. The termination for default was wrongful, arbitrary and capricious, and was simply not warranted by the facts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court find that the Corps' termination of the contract for default was wrongful, that the Court order the termination for default be converted to a termination for the convenience of the government that will effectively result in the reimbursement to Martin of all of the costs it incurred in the performance of the project, plus overhead and profit, and further requests that the Court enter judgment against the Corps

awarding Martin damages, interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: 4-16-09

*[signature]*

Michael H. Payne, Esquire
Cohen Seglias Pallas Greenhall
& Furman PC
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA 19103
Tel:   215-564-1700
Fax:   267-238-4456
e-mail: mhpayne@cohenseglias.com

Attorneys for Martin Construction, Inc.

Of Counsel:

Joseph A. Hackenbracht, Esquire
Cohen Seglias Pallas Greenhall & Furman PC

John T. Gassmann, Esquire