# In the United States Court of Federal Claims

No. 09-236C

(Filed: December 20, 2011)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

|  |  |
|---|---|
| **MARTIN CONSTRUCTION, INC.,** | Corps of Engineers Construction Contract; Default Termination; Failure to Make Progress vs. Failure to Meet Completion Date; Excusable Delay; Defective Specifications; Effect of Contract Modifications After Completion Date; Waiver; Conversion to Termination for Convenience. |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

*Michael H. Payne*, with whom was *Joseph A. Hackenbracht*, Cohen Seglias Pallas Greenhall & Furman, PC, Philadelphia, Pennsylvania, for Plaintiff.

*Melissa M. Devine*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, *Stanley E. Tracey*, Department of the Army, Corps of Engineers, Omaha, Nebraska, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiff, Martin Construction, Inc. ("Martin") from Gladstone, North Dakota brought the present action under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613 (2006) (current version at 41 U.S.C. §§ 7101-7109). Martin contracted with the U.S. Army Corps of Engineers ("the Corps") on August 30, 2007 to construct a marina in Garrison, North Dakota.[1]  Following more than thirteen months of attempted

---

[1]  In an irony of the events that were to follow, the Court cannot help noting the contracting officer's August 30, 2007 award letter to Martin exclaiming "Congratulations! . . . Congratulations on receipt of this contract award.  Your interest in work with the Omaha District is appreciated."

performance, the Corps terminated Martin's contract for default on January 13, 2009, after the contract completion date had passed. In this action, Martin seeks to convert the termination for default into a termination for convenience of the Government, thereby entitling it to reimbursement of the costs it incurred in performing the project, plus reasonable overhead and profit. Martin claims that the default termination was improper for two primary reasons: (1) the Corps' defective design and subsequent modifications caused most of the project delays, making it impossible to finish the project by the October 11, 2008 contract completion date; and (2) the Corps waived the October 11, 2008 completion date.

Martin filed its complaint in this Court on April 17, 2009, appealing the decision of the Contracting Officer ("CO") to terminate the contract for default. The Court held a four-day trial from March 7-10, 2011 in Omaha, Nebraska. Following the submission of post-trial briefs, the Court heard closing arguments on November 18, 2011 in Washington, DC. For the reasons explained in this opinion, the Court finds that the Corps' decision to terminate Martin's contract for default on January 13, 2009 was improper. The evidence at trial established that the Corps' cofferdam design suffered from a critical defect, which significantly impeded the construction of the project. In brief summary, the Corps mistakenly specified a porous gravel material for the first zone of the cofferdam, making it practically impossible to dewater the marina area. Martin's inability to dewater created successive project failures and safety concerns that prevented timely performance.

The most troubling aspect of this case is the Corps' adamant refusal to accept any responsibility for its defective design, even while Martin made every effort to comply with it. This relatively routine construction project[2] did not need to end in contentious litigation. Competent procurement officials would have acknowledged the agency's obvious design mistake, made the necessary corrections, and afforded the contractor the additional time and money to complete performance. The real difficulty here is not that the Corps made a serious design mistake, but that it denied the mistake throughout and steadfastly blamed the contractor instead. As all contracting personnel know, there are standard clauses in every federal contract to allow for changes and schedule adjustments, but these clauses are only effective when the federal agency acknowledges that they should be used.

When the contract completion date passed, and the Corps faced the question of whether to terminate Martin's contract or allow Martin to complete the project, the Corps attempted to retain its ability to do both. Although Martin deserved a significant time extension to complete the project, the Corps began assessing liquidated damages and reserved its right to terminate the contract for default. Beginning a few weeks later, the

---

[2] A unique feature of this project, however, was the severity of the winter weather in North Dakota. Any outdoor construction project in North Dakota must consider that work will be curtailed or stopped during mid-November through mid-March.

Corps issued two modifications altering the scope of work *but failed to grant Martin any additional time to perform the work.* The Corps' message to Martin was "we want you to perform the additional work specified in the modifications, but you are still in default because the completion date (already passed) remains the same." The Court cannot accept this nonsensical position. The doctrine of waiver is seldom applied in construction contracts, but this contract might well present the rare or exceptional circumstances in which waiver should be found.

Upon careful consideration of the parties' contentions and the entire record, the Court concludes that the termination of Martin's contract for default should be converted into a termination for the convenience of the Government. This conclusion is based upon the fact that the Corps provided a defective design, specifying the wrong material for the first zone of the cofferdam and rendering the dewatering of the marina area practically impossible. The inability to dewater the marina area led to contract modifications and safety concerns that further delayed project completion. The evidence is overwhelming that due to these excusable delays, Martin was entitled to a time extension well into the spring of 2009, such that the Corps' decision to terminate Martin's contract for default on January 13, 2009 was improper. In light of this conclusion in Martin's favor, the Court need not decide Martin's second contention on the issue of waiver.

In separately filed actions, the parties have lodged opposing claims for damages related to the dispute herein. See Martin Constr. v. United States, No. 11-643 (Oct. 4, 2011); No. 11-066 (Feb. 1, 2011); No. 09-748 (Nov. 2, 2009). This decision resolves only the issue of liability stemming from the default termination. As set forth in the Court's November 21, 2011 Order, the Court will address the parties' damages claims henceforth in one consolidated action. See Order, Martin Constr. v. United States, No. 09-236 (Nov. 21, 2011), Dkt. No. 71.

Findings of Fact[3]

I.   Contract Award and Performance Schedule

On August 30, 2007, the U.S. Army Corps of Engineers, Omaha District, awarded Contract No. W9128F-07-C-0026 ("the contract") to Martin Construction, Inc. DX 1; Stip. 1.[4] Martin is owned by Kurt Martin, who also serves as the company's president.

---

[3] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion section of this opinion.

[4] In this opinion, the Court will refer to the trial transcript by page and witness as "Tr. __ (Name)," and to trial exhibits as "PX __" for Plaintiff's exhibits; "DX __" for Defendant's exhibits; and "JX __" for Joint exhibits. The parties' pretrial stipulations of fact, filed on February 18, 2011, are referred to as "Stip. __." For lengthy exhibits, the citation includes the numerical portion of Bates numbers, e.g., "DX __, ACE__."

Tr. 764 (Martin).  The contract provided for the construction of a marina, as well as a concession building, parking lot, and access road, on the northern shore of Lake Sakakawea in Fort Stevenson State Park in Garrison, North Dakota.  DX 1; Stips. 2-3. The Corps awarded the contract for a fixed price of $6,997,859.74 with options, pursuant to a sealed bid procurement under Federal Acquisition Regulation ("FAR") Part 14. Stips. 6-8.

The contract performance period was not to exceed 365 days, and the original contract completion date was September 20, 2008.  Stip. 11.  During the course of performance, the Corps issued three modifications, resulting in a revised completion date of October 11, 2008.  See Stips. 12-14.  To construct the Fort Stevenson Marina, the contract required Martin to build a cofferdam[5] to restrain the water from Lake Sakakawea and allow Martin to excavate the marina under dry conditions.  See Stip. 15.  In large part, the issues presented in this case arise from Martin's contention that the cofferdam design was defective, resulting in major construction problems that prevented Martin from completing the project by the October 11, 2008 completion date.  See, e.g., JX 238.

II.   Cofferdam Design

Under the contract, Martin was to construct the cofferdam in two zones:   an underwater fill zone and a zone composed of compacted earth fill.  PX 20; see also Stip. 16.  Underwater fill is typically a high-strength granular material, Tr. 404-06 (Matuska), and in this case, the contract specified that the material for the underwater fill would be State of North Dakota Type 7 Aggregate (Class 7 Permeable Base Aggregate) ("N.D. 7") or its equivalent, DX 1, ACE16061; Stip. 18.

The contract also included instructions directing the sequence of the cofferdam construction:

> NOTE:    AFTER UNDER WATER FILL IS PLACED, DEWATER AREA.    THEN PLACE GEOTEXTILE, AND PLACE COMPACTED EARTH FILL.

PX 20.  The cofferdam's designer, Terry Matuska confirmed that this was the intended construction sequence.   Tr. 413.   The contractor was to place the underwater fill composed of N.D. 7 and then dewater the area by continually pumping water from the inside of the marina.  Id. at 413-15.  Once dewatering was complete, the contractor was to

---

[5] The RS Means Construction Dictionary defines a cofferdam as "[a] watertight enclosure used for foundation construction in waterfront areas.  Water is pumped out of the cofferdam allowing free access to the work area."  (4th ed. 2010).  As the Administrative CO for the project explained, "[t]he purpose of the cofferdam is to have a temporary structure to hold back the water while the marina could be excavated safely on the dry side."  Tr. 182 (Mailander).

place the geotextile material (a woven synthetic fabric) on top of the underwater fill and then place the compacted earth fill on top of the geotextile fabric.  Id. at 413, 416-17.

Mr. Martin testified that he envisioned the construction sequence to take place in two stages.  Stage one would include placing the underwater fill, dewatering the inside of the marina, and excavating waste from the inside of the marina.  Tr. 784-85.  Stage two would include constructing an underwater toe drain,[6] placing the geotextile fabric, and placing the compacted earth fill.  Id.  This sequence is consistent with how Martin's expert interpreted the contract specifications.  See Tr. 1138-39 (Schwartz).

## III.    Cofferdam Construction

Martin began placing the underwater fill on December 6, 2007 and then ceased placement for the winter season on December 26, 2007.  Stips. 21-22.  Martin resumed work on March 18, 2008 and finished placing the underwater fill in early April 2008.  Stip. 23; Tr. 788 (Martin).  By all accounts, Martin did a good job on this phase of the construction.  See Tr. 107-08 (McCormick), 261, 274 (Mailander).

Following the construction sequence, once Martin had finished placing the underwater fill, it began dewatering the marina in mid-April 2008.  Tr. 788-89 (Martin); see also PX 84.  Martin commenced dewatering with a four-inch pump, but when that failed to decrease the water level more than one foot, see Tr. 1073 (Aarseth), Martin brought in a 12-inch Crisafulli pump on April 30, 2008, Tr. 790-91 (Martin), 1132 (Schwartz); see also PX 84.  When the larger pump likewise failed to reduce the water level sufficiently, Martin sent a letter to the Corps on May 2, 2008, requesting a change in the method of cofferdam construction.  PX 65.  In the letter, Martin explained:

> After placing the underwater fill and pumping the water trapped on the marina side of said fill, it is obvious that water is migrating or infiltrating through the underwater fill at a rate equal to our pumping.  Additional pumps are not the answer.  Martin Construction's fear is that the more water that infiltrates through the underwater fill, the larger the pores will become, with a potential disastrous effect. . . .
>
> . . . .
>
> Martin Construction believes placing a wedge of clay against the underwater fill will seal off the infiltrating water and allow for a safe working condition to complete the marina.

---

[6] A "toe" is "[a]ny projection from the base of a construction or object to give it increased bearing and stability."  RS Means Construction Dictionary (4th ed. 2010).  The "toe drain," or "drainage toe," simply collects water and carries it away from the cofferdam.  Tr. 1057-58 (Martin).

Id.

The Corps' Mr. Matuska testified that he thought Martin's plan was a "good idea," Tr. 479, and on May 6, 2008, the Corps responded with a letter saying that it considered it "technically acceptable to place uncompacted clay material along the cofferdam underwater fill material to facilitate [the] dewatering effort," PX 67. The letter provided that the clay wedge should be approximately twelve feet wide and placed in one continuous operation. Id. It also indicated that the placement of geotextile material between the underwater fill and the uncompacted clay could be deleted from the contract and that Modification R00008 had been issued to address this deletion. Id. Attached to the letter, the Corps provided a drawing illustrating that Martin should place the clay wedge on the inside of the cofferdam. See Tr. 288 (Mailander), 1088-90 (Hachfeld); see also PX 66.

Martin began placing uncompacted clay against the inside slope of the underwater fill on or about May 9, 2008, while concurrently pumping water out of the marina. Tr. 797 (Martin); see also PX 84. Mr. Martin testified that the object was to place the clay wedge and raise the cofferdam to elevation 1825 but that Martin could not get the water pumped out, the clay wedge was "sliding continuously," and the project was experiencing "slope failures." Tr. 890. According to Martin's records, Martin worked to place the clay wedge while pumping water out of the marina from May 9 to May 21, 2008. See PX 84. With the clay wedge against the underwater fill, Mr. Martin testified that Martin was able to decrease the water level but that the clay wedge was "never stable" because it was sitting on an unstable foundation. Tr. 797-98.

Shortly thereafter, in June 2008, the project experienced heavy rains, which led to rapidly-rising lake levels. According to a schedule of work conducted at the site through the end of June, Martin could not work on the cofferdam from June 3 through June 13, 2008 because of rain or wet conditions. See PX 84. The original contract anticipated fluctuating water levels; however, it projected that the water level would be approximately 1813 feet above sea level. See PX 20. Based upon this projection, the original design called for the top elevation of the cofferdam to reach 1825 feet. Id. By July 3, 2008, the water level had reached 1820 feet. PX 73; PX 82.

In a letter dated July 3, 2008, Mr. Martin informed the Corps that he considered the change in water level to constitute a differing site condition. PX 82; Stip. 25. While the Corps disagreed that the lake fluctuation was a differing site condition, see PX 83, it nevertheless directed Martin to build the cofferdam to elevation 1830, PX 86; Tr. 50 (McCormick). On July 22, 2008, Martin completed raising the cofferdam to elevation 1830, Stip. 26, and by July 25, 2008, the lake had risen to 1825 feet, PX 73. To account for the severe weather and the increase in the scope of work to raise the cofferdam to elevation 1830, the Corps issued two unilateral modifications in July 2008, which

extended the contract performance time by a total of 19 days.  Tr. 48 (McCormick); Stips. 12-13.

Mr. Martin testified that the heavy rains further increased the flow of water through the cofferdam and contributed to the "sloughing" of the uncompacted clay.  Tr. 799-800.  Martin's supervisor on the project, Mr. Aarseth confirmed that although the clay wedge helped decrease the water level, it was unstable and tended to slip.  Tr. 1075 (Aarseth).  The instability of the clay wedge led to concerns regarding the overall stability of the cofferdam.  See, e.g., JX 228.  In a letter dated July 1, 2008, the Corps criticized Martin for failing to stabilize the cofferdam according to the modified design, stating:

> The dewatering effort identified in referenced serial letter [JX 170] was not implemented in a continuous operation as previously agreed upon.  Clay sloughing of the partially completed cofferdam has been increasing to the point that it could possibly cause a failure.  You must complete the construction of this important phase of work safely and quickly to avoid a possible major construction schedule impact.

Id.

The next day, July 2, 2008, Martin sent the Corps a letter with the subject "NOTICE OF DEFECTIVE DESIGN AND EXTREME SAFETY HAZARD."  JX 230.  The letter stated Martin's belief that the use of N.D. 7 for the underwater fill prohibited effective dewatering, a "critical step of the cofferdam construction."  Id.  The letter further asserted that "[t]he defective design . . . does not allow Martin . . . to properly dewater the site" and "is not allowing the cofferdam to be built under planned conditions and therefore safety is a major concern."  Id.  Martin requested that the Corps obtain a hydraulic engineer to redesign the cofferdam, id., and temporarily suspended work on the marina side of the cofferdam due to safety concerns, see JX 238; see also JX 259 (indicating that Martin continued work in what it considered safe areas).

The Corps responded on July 3, 2008, acknowledging that "safety hazards exist" but attributing those hazards to Martin's failure to "diligently complete[] the construction of the cofferdam in accordance with the plans."  JX 232.  In its July 3 letter and a subsequent letter dated July 7, 2008, the Corps denied that the cofferdam design was defective, JX 232; JX 237, and repeatedly directed Martin to install clay fill to stabilize the toe of the as-built cofferdam and allow the elevation of the cofferdam to be raised, JX 237; JX 241.

Mr. Martin testified that Martin attempted three times to place the underwater toe but that it was impossible to place the toe as directed because of silt accumulating from

mud slides off the cofferdam. See Tr. 804-05 , 892; see also JX 259. Mr. Martin testified that when his personnel attempted to place the clay fill on July 10, 2008, "we basically almost lost the cofferdam completely." Tr. 811-13.

The next day, the Corps sent Martin a letter entitled, "Revised Direction, Stabilization of Cofferdam." JX 250. The letter directed Martin to use "uncleaned field stone" ("dirty rock") rather than the clay material for the toe of the cofferdam and instructed Martin to place the dirty rock "using the same procedure previously identified for the clay material." Id.; see also Tr. 204-05 (Mailander). Martin performed as instructed and finished placing the dirty rock on July 15, 2008. See JX 254. Mr. Mailander, the area engineer for the Corps' Black Hills office and the administrative CO for the Fort Stevenson project, testified that the dirty rock functioned as a replacement for the drainage toe originally specified in the contract. Tr. 178, 218. Mr. Martin testified that it was like "makeshift sheetpiling . . . to try to hold everything back." Tr. 893. With the dirty rock in place, Mr. Mailander testified that there was a working cofferdam by the end of July such that Martin was able to proceed with the project. Tr. 205-06.

IV.   Cofferdam Stability and Modifications

Although the Corps contended that a working cofferdam existed by the end of July 2008, id., Martin continued to express to the Corps its concern that the existing structure was unstable, Tr. 288 (Mailander), 826-28 (Martin); see, e.g., JX 279. In a letter dated July 29, 2008, Martin wrote that "[t]he [d]efective cofferdam design created continued problems which are ongoing and is a potential loss of life situation which your refusal to acknowledge is second by second increasing the chance of loss of life." JX 279. That same day, the Corps issued a letter continuing to deny any defects in the cofferdam design and stating that "[t]he cofferdam has now been safely rectified." JX 278.

Nevertheless, sometime between mid-July and early August, the Corps established a "no-cross line," prohibiting Martin from excavating west of a line located approximately 100 feet east of the cofferdam structure. See JX 286; see also Tr. 820 (Martin). Mr. Martin testified that Mr. Matuska verbally instituted this no-cross line on July 18, 2008 because the cofferdam was "failing again" due to cracks in the structure. Tr. 820. By contrast, Mr. Mailander testified that Mr. Martin requested the no-cross line. Tr. 178, 333. Regardless of the impetus for establishing the no-cross line, Mr. Mailander testified that the Corps established it to allow the cofferdam to settle and stabilize and because the Corps did not want Martin to undermine the cofferdam. Tr. 224, 333. A letter from the Corps dated August 1, 2008, stated that the Corps instituted the no-cross line "[b]ecause of mutual concern regarding the sequence of the marina excavation." JX 286. According to Mr. Martin, the no-cross line remained in effect until September 26, 2008. Tr. 820-21, 937-38 (Martin).

In addition, during the July-August timeframe, both parties engaged third-party experts to evaluate the stability and safety of the cofferdam structure, including the north and south abutments. Tr. 288-91 (Mailander). Martin retained Dr. Paul Schwartz, a civil engineer with a geotechnical specialty, to inspect the worksite and provide his opinion on the stability of the existing cofferdam structure, future marina excavations, and future construction of the marina abutments. Tr. 1112, 1168 (Schwartz); see also PX 128. At the beginning of August, the Corps retained Terracon Consultants, Inc. to assess the strength and stability of the cofferdam structure. Tr. 50 (McCormick), 437 (Matuska), 846 (Martin), 1173 (Schwartz).

Dr. Schwartz conducted an on-site visit on August 13-14, 2008, at which time he reviewed the contract plans and specifications and inspected the site. Tr. 1126-27 (Schwartz); see also PX 128. Based upon his independent analysis, he concluded that the safety factor for the underwater fill was 0.93. Tr. 1156 (Schwartz). Both Dr. Schwartz and the Government's geotechnical engineering expert, Dr. William L. Deutsch testified that a factor of safety equal to or less than one is unsafe and represents "incipient failure." Tr. 572 (Deutsch), 1156, 1159 (Schwartz). Accordingly, Dr. Schwartz concluded that the overall cofferdam had a "very low stability." Tr. 1159 (Schwartz).

On behalf of Martin's consultant, Westbrook Engineers, Dr. Schwartz drafted a letter dated August 18, 2008, which was forwarded to the Corps and set forth his conclusions and recommendations based upon his site visit and review of the contract specifications. Tr. 1168-70 (Schwartz); PX 128. The letter summarized that "our major concern is for the stability of the entire embankment cofferdam (i.e. due to the crack forming this week), and more importantly, the stability of the cofferdam and marina abutments during any subsequent excavations or fill placements." PX 128. Accordingly, the letter urged:

> We strongly recommend that the following be implemented immediately:
>
> *All marina excavation and embankment fill placements shall be ceased near the cofferdam embankment and the north and south abutments until a safe and functional engineering and construction solution can be developed.*

Id. (emphasis in original). Due to evidence of cracking and instability, Dr. Schwartz further recommended that the Corps develop "a detailed subsurface exploration and testing program" and conduct "a rigorous analytical slip stability analysis" before excavating the toe or filling on the abutments. Id.; Tr. 1169-70 (Schwartz).

On August 22, 2008, the Corps informed Martin that it considered the cofferdam and north embankment to be in "stable condition," JX 333, and during the latter half of

August, the Corps repeatedly directed Martin to fill the abutments to elevation 1830, see id.; JX 353. At the same time, Dr. Schwartz continued to monitor the worksite and advised that it would be unsafe to do so. Tr. 1176-79 (Schwartz). Dr. Schwartz drafted a follow-up letter to the Corps, dated September 3, 2008, in which he reiterated the safety concerns expressed in his August 18 letter. See PX 130.

On September 10, 2008, representatives from the Corps held a meeting with Mr. Martin and Dr. Schwartz. Tr. 61-62 (McCormick), 838, 846 (Martin), 1173 (Schwartz); see also JX 371. At the meeting, the Corps indicated that they were employing Terracon to do a strength and stability analysis of the cofferdam structure, as Dr. Schwartz had suggested. See Tr. 837, 846 (Martin), 1173 (Schwartz). In addition, the Corps' Chief Engineer, Omaha District, John Bertino asked Martin to fill the north and south abutments to elevation 1830 by November 1, 2008. Tr. 845 (Martin). According to Mr. Martin, Mr. Bertino indicated that doing so would put the Corps in a good position to finish the project by spring. Tr. 845 (Martin). Martin finished raising the abutments to elevation 1830 on September 30, 2008. Id.

In a series of emails from late September through early November 2008, Corps personnel discussed the propriety of continuing to fill the north and south abutments. In an email dated September 29, 2008, Robert Michaels, Chief of the Construction Division, wrote to Mr. Bertino:

> Martin Construction is moving dirt well and has the South abutment going up. Could be 1830 by Tuesday. We need approval to direct Martin to continue higher on the South Abutment to 1855. We need to give him this direction today if possible so he has no excuses to stop. Are we good to go on the South Abutment up to 1855?

PX 153, ACE002986.

Corps employee, Brad Jones responded the next day, informing Mr. Michaels and additional Corps personnel that "based on the independent geotechnical analysis performed the week of 15 September, there is concern with raising the south abutment above El. 1830." Id. at ACE002985. He continued, "We won't know if this is a real issue until the stability analysis is completed by Terracon." Id. Mr. Jones further stated, "I am hopeful Martin will stop building the abutments once he reaches E. 1830 on his own, as he indicated was his plan to Terry Matuska last week. This would give us time to complete the analysis and get a good read on the stability of the south abutment." Id.

Nearly a month later, in an email dated October 23, 2008, Mr. Jones informed Corps personnel that the "[r]esults of the [stability] analysis indicate the south abutment

will not be stable without modification once the cofferdam is removed."  PX 156, ACE002438.  His email outlined a proposal for going forward:

> The best approach seems to be adding a berm in the abutment at El. 1825 and reducing excavation depth of the cofferdam to El. 1800.  This will result in removal of soil previously placed on the abutment, thereby reducing the driving force and increasing stability.  The berm would be about 30 feet in width, starting at the radius on the marina side, transitioning back into the abutment on the lake side.

Id.

Also on October 23, 2008, Martin's consultant, Westbrook Engineers sent the Corps a letter requesting the results of Terracon's analysis.  See PX 157.  That same day, Mr. Jones informed Corps personnel via email that "[Terracon] plan[s] to complete analysis of the north abutment by Friday, Oct. 31, and issue a final report by 7 November."  PX 156, ACE002439.  Terracon finalized its analysis of the south abutment on October 28, PX 159, ACE005469, and on October 31, the Corps issued Modification 17 to implement Terracon's recommendations concerning the south abutment, see PX 161.

While analysis of the south abutment was concluding, the parties awaited the results of the stability analysis of the north abutment.  On November 4, 2008, the Corps' on-site construction representative, Loren Nishek sent an email to Corps personnel, in which he stated that the "north abutment may have the same 1830 bench as the south abutment which will require a revised grading plan to be given to the contractor."  PX 162, ACE006503.  Mr. Nishek's suspicions were confirmed in an email that same day from Mr. Jones:  "As expected, we need a 30-foot wide bench at El. 1830 on the north abutment with excavation of C-Dam to El. 1800 to be stable."  PX 163.

On November 20, 2008, Westbrook Engineers sent a second letter to the Corps requesting the results of Terracon's analysis.  See PX 170.  On November 28, the Corps issued Modification 18 to implement Terracon's recommendations concerning the north abutment.  See PX 173.  Terracon ultimately issued its report on December 3, 2008.  PX 174; Tr. 1178 (Schwartz).

The basis of Terracon's report was a field investigation it conducted September 15-20, 2008 to "[p]erform independent stability analyses of the cofferdam and associated abutments."  PX 174, ACE102629.  In its report, Terracon noted that "[t]he sloughed soft clays and silty lake sediments" in the north and south abutments are "the critical strata relative to the potential slope stability."  Id. at ACE102632.  Based upon samples of the critical strata, Terracon recommended "revisions to design slope geometry . . . for both of

the abutments to produce an appropriate factor of safety." Id. at ACE102633.  It also recommended that pore pressure piezometers ("PZs")[7] "be installed and monitored to establish pore pressure trends for at least several weeks before additional fill placement [on the abutments] begins." Id. at ACE102634.

V.   Martin's Termination

After an exchange of letters throughout July and August, wherein Martin and the Corps disagreed on the stability and safety of the existing cofferdam structure, the Corps sent Martin a letter on September 5, 2008, in which it threatened to terminate the contract.  In its September 5 letter, the Corps offered Martin the opportunity to "show cause" why the contract should not be terminated for default due to Martin's failure to make progress to meet the contract completion deadline.  Stip. 29.  Mr. McCormick, Chief of Civil Works in the Corps' Contracting Division, testified that the Corps wrote the show cause letter because Martin "refused to place some fill past . . . west of an excavation line" and was not going to meet the October 11 completion date.  Tr. 53.

Martin responded with a letter on September 12, 2008, attributing delays to "unforeseeable causes beyond the control of and without fault or negligence of Martin Construction, Inc.," and listing 26 acts or omissions by the Corps "causing Martin to incur increased costs and impeding project completion."  JX 387.  On September 18, 2008, the Corps replied with a letter denying any "excusable delay" and requesting a complete construction schedule and topographical survey information for the placement of the underwater fill.  JX 400.  Also on September 18, 2008, the Corps issued Martin an Interim Unsatisfactory Performance Appraisal.  PX 139; Stip. 31.

Mr. McCormick testified that the Corps held a meeting with Mr. Martin the next day, during which Mr. Martin assured the Corps that he would complete the contract before winter.   Tr. 58.   At the meeting, Mr. Martin provided the Corps with the topographic survey information, as well as an updated construction schedule showing a completion date of December 2008.  Id.

On September 24, 2008, the CO sent Martin a letter stating, "While I still consider Martin Construction to be delinquent in the performance of the contract, I am holding the contract termination in abeyance pending progress that is made on the south abutment and riprap placement over the next ten days."  PX 151.  Mr. Martin testified that he interpreted "progress" to mean that Martin should raise the north and south abutments to elevation 1830 by November 1, 2008, as Mr. Bertino had directed in the meeting on September 10, 2008.  Tr. 845 (Martin).  As noted, Martin finished raising the abutments

---

[7] In an email dated November 19, 2008, Mr. Jones explained to Corps personnel that PZs are "monitoring devices" used "to measure the effect on underlying soft materials of placing additional embankment materials."  PX 166, ACE005503.

to elevation 1830 on September 30, 2008, and Mr. McCormick testified that Martin made "very good progress" during this time.  Tr. 156-57.

However, shortly thereafter until December 9, 2008, Mr. McCormick testified that Martin did not make good progress and that the Corps expected Martin to make even less progress with the onset of winter weather.  Tr. 153.  Mr. Martin conceded that from the end of September through December, Martin halted almost all fill placement because of problems with wet material and because Mr. Bertino had directed Martin to cease filling the abutments once it reached elevation 1830.  Tr. 845, 854 (Martin).  Mr. Martin testified, however, that Martin continued "placing riprap and excavating."  Id.

During this time, Martin continued to submit updated schedules and narratives, pursuant to contract requirements, but it often qualified its submissions.  For example, in a letter attached to a schedule submitted on October 31, 2008, Martin wrote:  "This schedule is purely speculative given the constant design changes and changed/differing site conditions.  The preliminary analysis provided . . . is not only identified as preliminary but also very difficult to read and understand given the all black and white print out accompanying the letter."  PX 160.

On October 30, 2008, the Corps reprimanded Martin again for falling behind schedule.  See JX 503.  Martin responded that "the defective design is every day changing the scope of work and the scheduling of work."  JX 506.  On October 31, 2008, Martin submitted for the first time a schedule showing a spring completion date of April 21, 2009 (all previous schedules had reflected a winter completion date).  See JX 510.

On December 9, 2008, Mr. Martin met with Corps representatives, including Mr. Mailander, Mr. McCormick, and Mr. Nishek.  Tr. 66-67 (McCormick).  Mr. McCormick testified that by early December, it was clear that Martin was not going to finish the contract in December, as Martin still needed to complete the abutments, excavate the interior marina, finish placing riprap, and complete construction of the concession building.  Tr. 67-68.  In Mr. McCormick's view, the purpose of the December 9 meeting was to find an orderly end to the contract without a termination for default or a termination for convenience.  Id.  At the meeting, the Corps proposed a deletion of work, such that once Martin finished excavating the interior of the marina, the contract would be complete.  Tr. 68-69 (McCormick); see also JX 646.

Martin responded on January 7, 2009, requesting deletion of all remaining work through a termination for convenience.  See JX 671.  On January 12, 2009, the Corps responded that a termination for convenience "is not an acceptable alternative," JX 673, and on January 13, 2009, the Corps sent Martin a letter terminating the contract for default, JX 674; Stip. 34.  In its default letter, the Corps wrote that "the failure to meet the contractual completion date of October 11, 2008 and any subsequent projected dates is inexcusable."  JX 674.  The letter provided that "[t]he severe weather experienced in

13

North Dakota over the past several weeks was not a factor in this determination," noting that Martin "had an obligation to substantially complete the contract prior to the onset of winter weather." Id.

Discussion

I.   Burden of Proof

The Federal Circuit has held that a termination for default is "a drastic sanction, which should be imposed (or sustained) only for good grounds and on solid evidence." Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987) (citing J.D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431 (Ct. Cl. 1969); Schlesinger v. United States, 390 F.2d 702, 709 (Ct. Cl. 1968)); see also H.N. Bailey & Assocs. v. United States, 449 F.2d 387, 391 (Ct. Cl. 1971) (same).   The Government bears the burden of proof to show that the contractor was in default at the time of termination. Lisbon Contractors, 828 F.2d at 763-64.   If the Government establishes that the contractor was in default, then the contractor must show that its default was excusable. TGC Contracting Corp. v. United States, 736 F.2d 1512, 1515 (Fed. Cir. 1984); Nat'l Eastern Corp. v. United States, 477 F.2d 1347, 1356 (Ct. Cl. 1973).   A contractor can demonstrate that the default was excusable "by showing that improper government actions were the primary or controlling cause of the default."   Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 253 (2007).   If the court finds that the default was excusable, the termination for default is converted into a termination for convenience. Pinckney v. United States, 88 Fed. Cl. 490, 506 (2009) (citing Keeter, 79 Fed. Cl. at 262).

II.   Propriety of Default Termination

Here, it is not disputed that Martin failed to complete the marina project by the contract completion date of October 11, 2008.   Martin contends, however, that the default termination was improper for two primary reasons.   First, Martin contends that the Corps, by specifying the use of N.D. 7 for the underwater fill, provided a defective design specification. (Pl.'s Br. 36-38, Sept. 23, 2011.)   According to Martin, the use of N.D. 7 allowed too much water to flow through the cofferdam, preventing Martin from making progress on work that needed to be performed under dry conditions and rendering the cofferdam unstable such that project modifications were necessary. (Pl.'s Br. 25, Oct. 31, 2011.)   In Martin's view, the delays that resulted from the use of N.D. 7 and the subsequent modifications were therefore "legally excusable and unavailable as grounds for a default termination." Id. at 43.   Second, Martin alleges that the Corps' issuance of an "abeyance letter" on September 24, 2008 and subsequent conduct amounted to a waiver of the October 11, 2008 contract completion date. (Pl.'s Br. 58, Sept. 23, 2011.) Martin contends that, due to the Government's waiver, it was improper for the Corps to terminate the contract based upon Martin's failure to meet the October 11 date. Id. at 62.

For its part, Defendant denies that there was excusable delay and maintains that it was entitled to terminate the contract for default because Martin failed to meet the contract completion date. Although Defendant ultimately conceded that its cofferdam design was defective, it nevertheless alleges that Martin caused the project delays through its failure to build the cofferdam as designed and by its self-imposed delays. (Def.'s Br. 34, Oct. 31, 2011.) Even assuming excusable delay, Defendant contends that it was entitled to terminate Martin for failing to make progress, as Martin failed to show that it had the capability or intent to finish the project even by June 4, 2009, the completion date proposed in the last schedule that Martin submitted to the Corps. Id. at 12. Moreover, Defendant denies that its conduct constituted a waiver of the October 11, 2008 contract completion date. Id. at 13.

At the outset, the Court observes that this case involves a termination for failure to meet the contract completion date. "Termination for failure to make progress is distinct from termination for failure to meet contracted-for deadlines." Abcon Assocs., Inc. v. United States, 44 Fed. Cl. 625, 631 (1999) (citing Universal Fiberglass Corp. v. United States, 537 F.2d 393, 398 (Ct. Cl. 1976)). While a termination prior to the completion date is a termination "for failure to make progress," a termination after that date is a termination "for failure to meet a performance deadline." Id.

Defendant attempts to argue that, in addition to terminating the contract because Martin failed to meet the October 11, 2008 completion date, the Corps also terminated the contract because Martin failed to make progress. See (Def.'s Br. 29, Oct. 31, 2011). However, in its termination letter, the Corps cites the contract completion date of October 11, 2008, and states that the contracting officer "determined that [Martin's] failure to meet the contractual completion date of October 11, 2008 and any subsequent projected dates is inexcusable." PX 185. Immediately thereafter, the letter states that Martin's contract is terminated for default. Id. This language, along with the fact that the termination occurred after the completion date, indicates that the Corps terminated Martin for failing to meet the October 11 deadline.

In any event, the Corps could not justify a termination based upon failure to make progress because the Corps failed to establish a new contract completion date after the October 11 date had passed. As this Court has noted, a decision to terminate a contractor for failing to make progress "must be based on a correct understanding of the remaining work and the time left for completion." CJP Contractors, Inc. v. United States, 45 Fed. Cl. 343, 371 (1999). Accordingly, the contracting officer must know "not only how much work is left but also the correct contract completion date." Id.

Although the termination letter noted that "Martin Construction has now failed to progress satisfactorily in order to meet its January 2009 projected completion," PX 185, Mr. McCormick testified that the Corps never accepted Martin's proposed completion dates and instead, that the Corps maintained the October 11, 2008 deadline, Tr. 72-73.

15

Likewise, Defendant has conceded that it never established a new contract completion date once the October 11, 2008 deadline had passed.  <u>See</u> (Def.'s Br. 30, Sept. 23, 2011).  Without establishing a new contract completion date, the Corps had no benchmark for measuring Martin's progress and could not have assessed whether a termination for failure to make progress was warranted.

Given the overall substance of the termination letter, the fact that the termination occurred after the October 11, 2008 deadline, and the fact that the Corps never established a new contract completion date, the Court finds that the Corps' termination was for failure to meet a contracted-for deadline.  The parties agree that by October 11, 2008, the marina project was not completed.  <u>See</u> (Pl.'s Br. 67, Sept. 23, 2011); <u>see also</u> Tr. 64, 120 (McCormick), 867 (Martin).  The question, therefore, is whether the Corps was justified in terminating Martin's contract for failing to meet the October 11, 2008 completion date.

A.  Excusable Delay

Martin's first primary argument is that its failure to complete the project by the October 11, 2008 completion date was the result of excusable delay.  (Pl.'s Br. 67, Sept. 23, 2011.)  Martin cites the Corps' defective design and its subsequent directives and modifications as sources of excusable delay.  <u>Id.</u> at 36, 68-69.  Plaintiff alleges that the Corps' refusal to grant Martin an extension to account for these delays was a breach of the default clause in the contract, DX1, ACE15847, found at FAR 52.249-10, and thus, the termination for default was improper.  <u>Id.</u>

Specifically, Martin claims 170 days for delays caused by the Corps' defective design, including delays resulting from "the inability to dewater, the subsequent directives of the Corps to address problems with the cofferdam, and the directed and constructive changes in the composition and dimensions of the cofferdam."  (Pl.'s Br. 65, Sept. 23, 2011.)  Martin claims at least 71 days due to Modifications 17 and 18, which altered the construction of the north and south abutments.  <u>Id.</u> at 71.  In addition, Martin notes that the Corps issued Modifications 17 and 18 at a time of year when "a contractor could anticipate not working at all" due to adverse winter weather conditions.  <u>Id.</u> at 70.

Whether Martin is entitled to a time extension for these delays depends on whether the delays are "excusable" within the meaning of the default clause, FAR 52.249-10.  Paragraph (b) provides:

> The contractor's right to proceed shall not be terminated nor the contractor charged with damages under this clause, if –
>
> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault

> or negligence of the contractor.  Examples of such causes include
>
> . . . .
>
> (ii) acts of the Government in either its sovereign or contractual capacity.

FAR 52.249-10(b)(ii); DX 1, ACE15847.  To receive a time extension under this clause, the contractor must show that the delay was "excusable," meaning the delay was beyond its control; was not caused by its fault or negligence; and was unforeseeable.  CJP Contractors, 343 Fed. Cl. at 372 (internal citations omitted).  In addition, to warrant a time extension, the contractor must show that the excusable event delayed activities along the critical path, which consists of activities that must be performed on schedule so as not to delay the entire project.  Id.; Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 75 (1992) (citing Haney v. United States, 676 F.2d 584, 595 (Ct. Cl. 1982)).

### 1. Defective design

Martin first claims excusable delay on account of the Corps' defective cofferdam design.  (Pl.'s Br. 36, Sept. 23, 2001.)  Specifically, Martin claims that the specification to use N.D. 7 for the underwater fill was defective because it allowed too much water to flow through the stage one cofferdam and made dewatering practically impossible.  Id. at 37-38.  Martin maintains that the defective specification had a domino effect, causing continual project failures as Martin attempted to comply with the defective design.  Id. at 36.  As a result, Martin claims that the defective design and resulting effect prevented contract completion by the October 11, 2008 deadline and entitled Martin to an extension that would have established a new deadline in the late spring of 2009.  Id.

This Court has observed that "[g]overnment liability for faulty design specifications is well-settled: 'If the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.'"  Sterling Millwrights, 26 Cl. Ct. at 83 (quoting United States v. Spearin, 248 U.S. 132, 136 (1918)).

> Rather, when the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result. . . .  If the warranty is breached, i.e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications.

Id. at 84 (citing Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 638 (Ct. Cl. 1966)). Liability attaches, however, only if the contractor (i) relies on government "design specifications" and not merely "performance specifications," id., and (ii) fully complies with the design specifications, Tyger Constr. Co. v. United States, 31 Fed. Cl. 177, 243 (1994). If the contractor establishes that it fully complied with the design specifications, and that an unsatisfactory result occurred nonetheless, then the burden shifts to the Government to show that the unsatisfactory result was due to another cause, such as defective materials or workmanship. Ordnance Research, Inc. v. United States, 609 F.2d 462, 479-80 (Ct. Cl. 1979).

a.  Design specifications

Government specifications will be deemed design specifications where "the government sets forth in precise detail the materials to be employed and the manner in which the work [is] to be performed, and [the contractor is] not privileged to deviate therefrom." Sterling Millwrights, 26 Cl. Ct. at 84. Examples of design specifications include "detailed measurements, tolerances, materials, i.e., elaborate instructions on how to perform the contract." Id. By contrast, performance specifications merely set forth "an objective . . . to be achieved, and the successful bidder is expected to exercise his ingenuity" in selecting the means to achieve that objective. Id.

Here, the contract provided, in pertinent part:

> The underwater fill for the cofferdam shall consist of materials classified as GW, GP, SW, SP, ASTM D 2487. The material shall consist of a clean granular soil such as a pit run sand or sand with gravel. The material shall be State of North Dakota Type 7 Aggregate or equivalent. The contractor may utilize alternative materials, including recycled concrete, as long as the material is stable and free draining, and approved by the contracting Officer prior to use.

DX 1, ACE16061. Defendant does not contest that the contract required Martin to use N.D. 7 or its equivalent to construct the underwater fill. Stip. 17; see also Tr. 217 (Mailander). While the contract permitted the contractor to utilize "alternative materials," the contractor's discretion was limited, as the CO would have had to approve the use of any alternative materials. Moreover, the language, detail, and specificity of the pertinent provision indicate that the specification to use N.D. 7 for the underwater fill was a design specification. By directing the use of N.D. 7 or its equivalent, the Government set forth in precise detail the material to be used; it did not merely set forth an objective for the contractor to achieve through its own ingenuity. For these reasons, the Court concludes that the contract set forth a design specification when it specified the use of N.D. 7 for the underwater fill.

18

b.  Substantial compliance

In addition to showing that the contractor relied on a design specification, the contractor also must establish that it fully complied with that specification.  Tyger, 31 Fed. Cl. at 243.  Here, the issue of compliance does not appear to be in dispute.  The parties do not contest that Martin utilized N.D. 7 for the underwater fill, see Tr. 107 (McCormick), 784 (Martin), and, by all accounts, Martin did a good job on this phase of the construction, see Tr. 107-08 (McCormick), 261 (Mailander).  Accordingly, the Court finds that Martin fully complied with the design specification to use N.D. 7 for the underwater fill.

c.  Defective specifications

Lastly, to invoke the implied warranty, the contractor must show that the design specification was defective.  The evidence presented is overwhelming that the Corps' cofferdam design suffered from a critical defect.  Despite fully complying with the specification to use N.D. 7 for the underwater fill, Martin had great difficulty dewatering the marina and suffered many setbacks as a result.  Martin's expert in geotechnical engineering, Dr. Paul Schwartz explained that the Corps' design engineer erred when designing the underwater fill, grossly underestimating the amount of water that would flow through the stage one cofferdam.  Tr. 1149-50, 1154.  Specifically, Dr. Schwartz explained that the design engineer assumed a coefficient of permeability[8] for the underwater fill of 0.3 feet per minute.  Tr. 1149.  According to Dr. Schwartz, this rate of permeability is for a medium to fine sand—"far off from the permeability of [N.D. 7]," which is actually 23 feet per minute.[9]  Tr. 1128, 1149.  Using the permeability of sand rather than the permeability of N.D. 7 aggregate, the design engineer computed a permeability and flow rate that was *77 times too low*.  Tr. 1149, 1154 (emphasis added).  Thus, the design engineer erroneously concluded that the underwater fill would retain water so that the area behind the cofferdam could be dewatered.  However, based upon the permeability of N.D. 7 aggregate, Dr. Schwartz testified that "you could pump all day and not lower the groundwater table."  Tr. 1128.

The Corps compounded the problem by deleting steel sheetpiling from the cofferdam design in the original solicitation.  Dr. Schwartz testified that sheetpiling is a "standard criteria" for controlling seepage through granular materials, Tr. 1165 (e.g., N.D. 7), and Mr. Matuska confirmed that sheetpiling would have aided the dewatering effort if it had been installed, Tr. 464.  As of April 2007, steel sheetpiling had been

---

[8] The coefficient of permeability is the ease with which water moves through a structure.  Tr. 1128 (Schwartz).

[9] To permit a mental comparison between sand and N.D. 7, the average size of N.D. 7 aggregate is one quarter of an inch in diameter.  Tr. 408-09 (Matuska).

included in the cofferdam design, but just before the design was finalized, Mr. Matuska elected to delete it from the design.  See Tr. 462-63 (Matuska).  When asked why, Mr. Matuska responded that he deleted the steel sheetpiling to save money.  Id.

Dr. Schwartz testified that because the cofferdam design did not allow for successful dewatering, it frustrated the entire construction sequence.  See Tr. 1139-40. Dr. Schwartz reviewed the contract and testified that the construction sequence was to be as follows:  the contractor was to build the stage one cofferdam, which would serve as the "building block of the whole project"; then, the contractor was to remove the unsuitable soil, or lake sediment deposits; put down the geotextile material; and then place the compacted clay.  Tr. 1138-39.  Given the amount of water coming through the stage one cofferdam, however, Dr. Schwartz maintained that carrying out the construction sequence was "a practical impossibility."  Tr. 1139.  He explained:

> [I]f you've got all this water coming through this Stage 1 cofferdam, and no seepage control, and you can't get it dewatered, there is no way you're going to go in there and do that foundation prep and get those soft clay sediments under your main cofferdam.
>
> . . . [W]ith the water coming down that slope you're not going to be able to place that geotextile. . . .  [T]he water coming through the cofferdam wouldn't be able to get through that geotextile.  It would float it.
>
> And . . . how are you going to go in there and lay down compacted earth? . . .  If they couldn't dewater it, they would never get that compacted clay.
>
> So, it looked to me like unless they could dewater it[,] it was an impractical construction and . . . at that time it was very questionable whether they could dewater it . . . because of stability and movement . . . because of the excess of gradients at the water level[] and . . . the quantity of flow coming through.

Tr. 1139-40.

Beginning on July 2, 2008 and throughout the remainder of contract performance, Martin informed the Corps of its view that the cofferdam design suffered from a critical defect and needed to be redesigned.  See JX 230.  In its July 2 letter, Martin averred that the use of N.D. 7 was "not allowing proper dewatering," and as a result, "[t]his most critical step of the cofferdam construction was compromised."  Id.  Martin went on to state that "[t]he defective design, which kept Martin Construction, Inc. from applying the

fabric also does not allow Martin Construction, Inc. to properly dewater the site.  This is not allowing the cofferdam to be built under planned conditions and therefore safety is a major concern."  Id.  While Martin continually complained that the cofferdam design was defective and impeding progress on the project, the Corps responded by denying that its design was defective and blaming Martin for project failures.  See JX 232; JX 237.

At trial, Defendant's witnesses maintained this position.  Mr. McCormick testified that the cofferdam design was not defective and that Martin caused the problems with the cofferdam construction by deviating from the original cofferdam design and not proceeding with construction in a timely manner.  Tr. 77.  Likewise, Defendant submitted an "expert report" by Mr. Matuska, in which he espoused the view that "the problems that Martin encountered regarding the performance of the cofferdam arose from the way in which Martin constructed the cofferdam and the manner in which Martin dealt with the flow of water and was not as a result of the way in which the cofferdam was designed." DX 158.

It became evident, however, that Defendant could not refute the fact that the cofferdam design was defective.  Defendant made little effort to rebut Dr. Schwartz's convincing testimony.  In its brief cross-examination of Dr. Schwartz, Defendant did not question his testimony regarding the Corps' computation of the flow rate of the underwater fill or the general propriety of using N.D. 7 for the underwater fill.  See Tr. 1180-92 (Schwartz).  Most telling, however, was the fact that *nowhere* in its post-trial briefs did Defendant take issue with Dr. Schwartz's testimony or address whether N.D. 7 was the proper material to be used for the underwater fill.  See (Def.'s Br. Sept. 23, 2008; Def.'s Br. Oct. 31, 2008).  As Plaintiff's counsel aptly pointed out, Defendant "ignor[ed] the elephant standing amongst the teacups in the living room."  (Pl.'s Br. 26, Oct. 31, 2008.)

Apparently recognizing the weakness of its position, Defendant finally conceded, during post-trial oral argument, that the Corps' permeability calculations for the underwater fill were incorrect and that the specification of N.D. 7 for the underwater fill was defective.  See Transcript of Oral Argument (Nov. 18, 2011) ("Tr. Oral Arg.").  Notably, despite this concession, Defendant still asserts that Martin did not encounter excusable delay and that the default termination was proper.

d.  Causal connection

To refute Martin's claim of excusable delay, Defendant contends that the project delays resulted—not from its own defective design—but from Martin's failure to follow certain contract specifications and from Martin's self-imposed delays.  (Def.'s Br. 34, Oct. 31, 2011.)  Once the contractor has established that it fully complied with faulty design specifications, the burden shifts to the Government to show that the unsatisfactory result was due to another cause, such as defective materials or workmanship.  Ordnance

Research, 609 F.2d at 479-80.  The Government will be "relieved of liability irrespective of its faulty specifications, where the actual delays were occasioned by factors outside the government's control."  Remler Co. v. United States, 179 Ct. Cl. 459, 465 (1967) (citing J.D. Hedin Constr. v. United States, 347 F.2d 235, 244 (Ct. Cl. 1965), cert. denied, 389 U.S. 840 (1967)).

- Martin's alleged failure to follow certain contract specifications

According to Defendant, Martin's inability to dewater and the subsequent alterations in the cofferdam design resulted from Martin's failure to follow certain contract specifications.  See (Def.'s Br. 3, 32, Oct. 31, 2011).  Specifically, Defendant asserts that:  (1) Martin did not build the underwater fill drainage toe despite the Corps' directions to do so, id. 4-5; (2) Martin built the compacted earth fill at a slope steeper than that designed by the Corps, id. at 5; (3) Martin did not place the clay wedge and dewater "in one continuous operation," as directed by the Corps, id. at 6-7; and (4) Martin did not provide adequate dewatering methods to the project, id. at 7.  The Court addresses each of Defendant's assertions below.

> *Martin's failure to build the drainage toe as originally designed*

First, Defendant faults Martin for failing to build the underwater fill drainage toe, despite repeated direction from the Corps to do so.  (Def.'s Br. 5, Oct. 31, 2011.)  According to Defendant, if Martin had built the drainage toe prior to dewatering, it would have aided the dewatering process.  Id.  In addition, Defendant contends that Martin's failure to build the drainage toe even after Martin had dewatered the marina led to instability and necessitated the use of dirty rock.  Id.

The record demonstrates, however, that the Corps directed Martin not to build the drainage toe until *after* it had dewatered the inside of the marina.  In a May 6, 2008 letter, the Corps directed Martin to place the drainage toe "*after* the dewatering effort has been accomplished," PX 67 (emphasis added), and Mr. Martin confirmed receiving these directions from the Corps, Tr. 796, 911, 915.  Moreover, Mr. Martin testified that it would have been impossible to place the drainage toe without first dewatering the area: "I don't know how we would have put it in without dewatering it first . . . .  [T]hat toe was in a critical spot.  It couldn't be just guessed in.  It had to be measured in." Tr. 796.

Moreover, both Mr. Martin and Dr. Schwartz testified that because Martin could not get the water level below the top of the drainage toe, it was impossible to build the drainage toe as the Corps directed.  See Tr. 891-92 (Martin), 1185 (Schwartz).  Mr. Martin testified that his personnel attempted three times to place the underwater toe but that silt accumulating from mud slides off the cofferdam prevented them from doing so. He stated:

> [T]here's no way you were going to put that toe in as they were
> trying to describe. . . .  When you would take one scoop out with
> the trackhoe, one more scoop of mud would go right back in
> there.  You could have scooped all day long.  It was a failed
> process.

Tr. 804-05; <u>see also</u> Tr. 891-92 (Martin); JX 259 (asserting that the cofferdam's design prevented Martin from placing the underwater toe because it allowed in too much water). In fact, when Martin attempted to place the clay fill on July 10, 2008, Mr. Martin observed that "we basically almost lost the cofferdam completely."  Tr. 811-13.

The view that Martin could not construct the drainage toe as originally designed is corroborated by the fact that the Corps revised the cofferdam design, instructing Martin to use dirty rock, rather than clay, to construct the drainage toe.  <u>See</u> JX 250.  Mr. Mailander testified that the dirty rock replaced the drainage toe and served as an alternate toe.  Tr. 205, 218-19.  This revision came just one day after the cofferdam nearly failed. <u>See</u> Tr. 811-13 (Martin); JX 250.  In light of this evidence, the Court finds that Martin's failure to construct the drainage toe as originally designed was not the result of Martin's refusal to do so, but instead was another consequence of the excess water flowing through the stage one cofferdam due to the Corps' defective design.

> ➢ *Martin's construction of the compacted earth fill at a slope steeper than
>    that originally designed*

Second, Defendant points out that Martin built the compacted earth fill at a slope steeper than that designed by the Corps.  (Def.'s Br. 5, Oct. 31, 2011) (comparing DX 1, ACE10135 with DX 159, DEU00032).  Defendant has failed to explain, however, how the steeper slope of the compacted earth fill adversely affected the cofferdam construction, if at all.  When asked at oral argument how the steeper slope affected the cofferdam, counsel for Defendant reluctantly proffered that the steeper slope made the cofferdam more unstable.  <u>See</u> Tr. Oral Arg. (Nov. 18, 2011).  At the same time, however, Defendant was attempting to maintain that the cofferdam was stable as of September 2008.  <u>Id.</u>  Moreover, aside from counsel's proffer that the steeper slope rendered the cofferdam less stable, Defendant offered no evidence to support this position.  The Court finds that Defendant has not carried its burden of demonstrating that the steeper slope of the compacted earth fill had any appreciable effect on the cofferdam construction.  <u>See</u> <u>Ordnance Research</u>, 609 F.2d at 479-80.

> ➢ *Martin's alleged failure to place the clay wedge and dewater in one
>    continuous operation*

Third, Defendant contends that Martin did not construct the clay wedge as required and consequently, that the Government is not responsible for any of the delays

that resulted from placement of the clay wedge.  (Def.'s Br. 7, Oct. 31, 2011.)  To support its position, Defendant makes two arguments.  Defendant first contends that dewatering was a performance specification and therefore, Martin was responsible for implementing a successful dewatering plan.  Id. at 6.  Defendant maintains that the Corps merely approved the placement of the clay wedge as part of Martin's proposed dewatering plan. Id.  Second, Defendant maintains that even if placement of the clay wedge could be construed as a design specification, Martin did not follow the design specification because it did not place the clay wedge and dewater "in one continuous operation," as the Corps had instructed.  Id. at 7 (citing PX 67, ACE006996; JX 228, ACE0004935; Tr. 387:12-15 (Mailander)).

As a preliminary matter, it is not clear which party suggested use of the clay wedge, but the Corps ultimately supported and directed it.  Although Martin proposed use of the clay wedge in its May 2, 2008 letter, see PX 65, Mr. Martin testified that the Corps had requested the proposal, Tr. 794, 890, and the Corps ultimately directed placement of the clay wedge in its May 6, 2008 letter, see PX 67.  Furthermore, Mr. Mailander testified that the Corps thought the clay wedge "would work," Tr. 278, and Mr. Matuska agreed, stating that he thought Martin's proposal was a "good idea," Tr. 479.

The use of alternative means of dewatering, such as the clay wedge, was necessary only because of the large amount of water flowing through the underwater fill due to the Corps' defective design.  The record demonstrates that neither party anticipated use of the clay wedge:  it was not specified in the original design, and Mr. Mailander admitted at trial that it constituted a change in the method of cofferdam construction.  See Tr. 279-80 (Mailander).  Use of the clay wedge required the Corps to delete the geotextile material previously provided for in the original design, see PX 67, further indicating that it was an unexpected modification.  Instead, Mr. Matuska testified that he expected Martin to use pumps to dewater the marina, Tr. 415, and Mr. Martin confirmed that he anticipated using smaller pumps intermittently, Tr. 793, 899.  Thus, use of the clay wedge was not part of the "dewatering plan," for which Martin was responsible; use of the clay wedge was necessary only because of the Corps' defective design.  In attempting to place the clay wedge, Martin exerted reasonable efforts to remedy the dewatering problem that resulted from the Corps' defective design.  It was not required to do any more than that. See Connell Rice & Sugar Co. v. United States, 837 F.2d 1068, 1071 (Fed. Cir. 1988).

Defendant also contends that Martin is liable for the consequences flowing from use of the clay wedge because Martin did not follow the Corps' instructions when placing it.  (Def.'s Br. 7, Oct. 31, 2011.)  Specifically, Defendant asserts that problems arose because Martin failed to place the clay wedge (the uncompacted clay) and then the compacted clay in one "continuous" operation, thereby allowing the uncompacted clay to become saturated.  Id.; see also Tr. 196 (Mailander).  However, the evidence at trial demonstrated that it was not Martin's delay that caused the clay wedge to become saturated but the amount of water flowing through the underwater fill, the heavy rains in

May and June 2008, and the Corps' decision to place the clay wedge on the inside of the cofferdam.

Dr. Schwartz's testimony demonstrated that the clay wedge became saturated, in part, because of the amount of water flowing through the underwater fill:

> [Y]ou've got a lot of water coming through.  You have your lake sediments down there . . . so you don't have a firm base . . . and then you're going to place this clay into water and try to admit it to that slope that's flowing water, and in my mind that was just completely wrong . . . .
>
> So now you have . . . more very soft material that you can squeeze through your fingers, and then you're going to try to build a compacted clay on top of that?

Tr. 1142-43.

In addition, shortly after Martin completed placing the clay wedge (May 21, 2008), there were heavy rains, which led to rapidly-rising lake levels.  See PX 73.  On account of the rain, Martin could not work eleven days between May 30 and June 13, 2008, see PX 84, and the Corps increased the top elevation of the cofferdam by five feet, directing Martin to build the cofferdam to elevation 1830, PX 86; Tr. 50 (McCormick).  By July 25, 2008, the lake had risen to 1825 feet—the top elevation of the cofferdam as originally designed.  PX 20; PX 73.  To account for the severe weather and the increase in the scope of work to raise the cofferdam to elevation 1830, the Corps issued two modifications in July 2008, extending the contract performance time by 19 days.  Tr. 48 (McCormick); Stips. 12-13.  Mr. Martin testified that the rising lake levels increased the flow through the cofferdam and contributed to the "sloughing" of the uncompacted clay.  Tr. 799-800.

Moreover, Dr. Schwartz testified that the Corps erred when it directed Martin to place the clay wedge on the marina side, or inside, of the cofferdam.  Tr. 1141; see also Tr. 288 (Mailander), 1088-90 (Hachfeld) (testifying that the Corps provided Martin with a sketch illustrating that the clay wedge should be placed on the inside of the cofferdam); PX 66.  Dr. Schwartz explained that a more conventional method would be to place the impervious material on the lake side of the cofferdam.  Tr. 1140-41; see also PX 128, ACE007906.  In a letter to the Corps on August 18, 2008, Dr. Schwartz wrote:  "Such unconventional placement of the impervious clay material on the landside slope under hydraulic head, underwater, and in flowing seepage waters only aggravates the seepage conditions and causes more instability issues."  PX 128.  He explained at trial that placing the clay wedge on the marina side of the cofferdam resulted in an additional wet layer with the consistency of "chocolate pudding."  Tr. 1141-42.  As Martin attempted to build

the layer of compacted clay on top of it, the clay wedge would slide out, resulting in "mud waves." Tr. 1075 (Aarseth), 1142-43 (Schwartz). As explained in more detail below, this circumstance rendered the cofferdam unstable and led to further project delays.

The evidence shows that Martin was faced with a nearly impossible dewatering condition, through no fault of its own, as a result of the Corps' defective design. See Tr. 1143-44 (Schwartz). Faced with this situation, Martin put forth reasonable efforts to remedy it, including its attempt to place the clay wedge. See Tr. 796-97 (Martin). Instead of aiding Martin in its efforts, the Corps attempted to shirk responsibility for the situation, continually denying that the cofferdam design suffered from any defect. See JX 232; JX 237. Moreover, the Corps worsened the problems with the cofferdam by instructing Martin to place the clay wedge on the marina side of the cofferdam. Under such circumstances, the Court cannot endorse the Corps' continued attempts to deflect the blame onto Martin.

> ➤ *Martin's alleged failure to provide adequate dewatering methods to the project*

Fourth, Defendant claims that Martin aggravated the problems with the cofferdam by failing to provide adequate dewatering methods to the project. (Def.'s Br. 6, Oct. 31, 2011.) As noted above, Defendant maintains that dewatering the marina was a performance specification, and therefore, Martin was responsible for providing and implementing a successful dewatering plan. Id.; Tr. 217-18, 280-81 (Mailander). Defendant contends that Martin failed to do so because it used inadequate equipment and did not pump in a continuous manner as necessary to dewater the marina. (Def.'s Br. 7, Oct. 31, 2011); Tr. 458 (Matuska).

Again, nothing in the record indicates that the Corps expected Martin to utilize any method other than pumping to complete dewatering, as both Mr. Matuska and Mr. Martin testified that they expected that Martin would use pumps to dewater the marina. See Tr. 415 (Matuska), 793, 899 (Martin). Mr. Martin testified that he sent the Corps a certification projecting pumping costs of $50,000, based on a smaller pump working for a total of fifteen days. Tr. 876-77. According to Mr. Martin, the Corps signed and accepted the certification. Id.

Moreover, the record demonstrates that Martin exerted reasonable efforts to dewater the marina but that its efforts were frustrated by the amount of water flowing through the underwater fill. As previously noted, Martin began the dewatering process in mid-April 2008 with a four-inch pump. Tr. 788-89 (Martin), 1073 (Aarseth). When the four-inch pump failed to decrease the water level sufficiently, Martin tried a twelve-inch Crisafulli pump. Tr. 790-91 (Martin). Three different witnesses testified that the Crisafulli pump was so powerful that it began sucking up the underwater fill. Tr. 275

(Mailander), 791 (Martin), 1132 (Schwartz). Nevertheless, Martin still could not decrease the water level by any appreciable amount. Tr. 792 (Martin). Mr. Aarseth testified that more or different types of pumps would not have enabled Martin to dewater the marina because there was too much water coming through the underwater fill. Tr. 1073. Likewise, Dr. Schwartz testified that based on the coefficient of permeability of N.D. 7, Martin "could pump all day and not lower the groundwater table." Tr. 1128.

Mr. Matuska maintained that Martin could have dewatered the marina with pumping alone. Tr. 415-16. The problem, according to Mr. Matuska, was that "[t]he equipment that Martin initially used to deal with the flow of water through the underwater fill was inadequate and the dewatering operation was not continuous." Tr. 458. Mr. Matuska reached his conclusions, however, based upon the quality assurance reports that he had read. Tr. 473 (Matuska). He admitted that he did not observe the dewatering efforts personally in April, May, or June and that government observers on the job reported that the water was running into the marina as fast as Martin could pump it out. Tr. 473-74 (Matuska). Likewise, while Mr. Matuska testified that Martin did not properly dewater because it did not do so continuously, Tr. 455, Mr. Aarseth, who was on the project site 24 hours per day, testified that the pumps were running all the time, Tr. 1082 (Aarseth).

Mr. Matuska also testified that based on his calculations when designing the cofferdam, he believed it could be dewatered. Tr. 473. However, the Court accords little weight to Mr. Matuska's calculations, given his gross miscalculation concerning the underwater fill. Rather, in the words of Dr. Schwartz, the Court finds that it was "an impractical dewatering situation" at best. Tr. 1144. Faced with a water flow much greater than anticipated, see Tr. 899 (Martin) (testifying that he anticipated using smaller pumps intermittently but not continuously), Martin exerted reasonable efforts to adapt to the situation, by bringing in larger pumps and pumping for 24-hour intervals. The Corps' defective design created the impractical dewatering situation, and Martin was not required to exceed reasonable efforts to compensate for the Corps' error. See Connell Rice & Sugar Co., 837 F.2d at 1071.

In sum, Defendant's contention that Martin did not follow contract specifications is emblematic of the Corps' repeated attempts to blame Martin rather than take responsibility for the problems with the cofferdam construction. During the course of performance, the Corps repeatedly denied that the cofferdam design was defective, see, e.g., JX 232; JX 237, and instead attributed any problems to Martin's alleged deficiencies, see, e.g., JX 228; JX 232. Now, after conceding that the cofferdam design was defective, see Tr. Oral Arg. (Nov. 18, 2011); PP 1,[10] Defendant continues to invoke the same justifications. These excuses are insufficient to overcome the glaring defect in the cofferdam design. Based upon the foregoing, the Court finds that the Corps'

---

[10] During closing arguments on November 18, 2011, counsel for the Government utilized power point slides to aid her presentation. This opinion cites to the slides when appropriate as "PP __."

defective design caused the problems with construction of the stage one cofferdam. Accordingly, any delays resulting from Martin's efforts to comply with the Government's defective design during that time are excusable. See Sterling Millwrights, 26 Cl. Ct. at 78.

- Martin's alleged self-imposed delays

In addition to its claim that Martin did not follow certain contract specifications, Defendant also claims that delays on the project resulted from Martin's own self-imposed delays. (Def.'s Br. 34, Oct. 31, 2011.)  In particular, Defendant isolates the period between July 22, 2008 and January 13, 2009. See Oral Arg. (Nov. 18, 2011); PP 1. Defendant alleges that the cofferdam was stable as built by July 22, 2008, and that even Martin considered the cofferdam to be stable as built by September 2008. Id. At that point, Defendant claims, "[t]he cofferdam design and specifications are irrelevant." Id. In other words, Defendant suggests that Martin could no longer use the Corps' defective design as an excuse for delayed performance after July 22, 2008 or, at the latest, September 2008.  Nevertheless, Defendant claims that between July 22, 2008 and January 13, 2009, Martin completed the equivalent of only one month's work.  Id. According to Defendant, the Corps terminated Martin's contract for this reason. PP 2.

The Court disagrees with Defendant's representations.  Far from being "irrelevant," the Court finds that the Corps' miscalculation for the underwater fill had a domino effect, preventing the timely progression of construction even after July 22 and September 2008.  Dr. Schwartz testified that the stage one cofferdam was "the building block of th[e] whole project." Tr. 1138.  He maintained that "[i]f the Stage 1 cofferdam didn't function, nothing else could be done on the interior.  It was very important." Id. The continual problems with the stability of the cofferdam and abutments demonstrate that Dr. Schwartz was correct.

➢ *Stability concerns (July 22, 2008 – September 9, 2008)*

From the beginning of July until the end of September 2008, Martin delayed certain construction activities due to its concerns that the cofferdam and abutments were unstable.  Mr. Martin testified that because the clay wedge was sitting on an unstable foundation, it was "never stable" and simply created problems that would have to be dealt with later on in the project.  Tr. 797-98.  This view was confirmed when the cofferdam nearly failed on July 10, see Tr. 811-13 (Martin), prompting the Corps to direct Martin to place dirty rock against the underwater fill on July 11, see JX 250.  In addition, Martin realized for the first time on July 17 that the north abutment was also unstable, as chunks were falling off and it was experiencing slope failures.  Tr. 817 (Martin).  Mr. Martin testified that, on the following day, the cofferdam was failing again due to cracks in the structure.  Tr. 820.  Accordingly, Martin was concerned not only about the current

stability of the cofferdam, but also its continued stability as Martin excavated at the toe of the cofferdam and placed fill on the abutments.  Tr. 1126 (Schwartz).

As of July 3, 2008, the Corps had acknowledged that "safety hazards exist due to the current state of the construction of the cofferdam."  JX 232.  However, after Martin finished placing the dirty rock on July 15, <u>see</u> JX 254, and completed raising the cofferdam to elevation 1830 on July 22, Stip. 26, Mr. Mailander maintained that a working cofferdam existed, Tr. 205-06.  Apparently believing that the dirty rock had ameliorated the stability problems with the cofferdam, the Corps wrote on July 29, 2008 that "[t]he cofferdam has now been safely rectified."  JX 278.

At the same time, Mr. Martin continued to communicate to the Corps his view that the cofferdam design was defective and that the cofferdam remained unstable and unsafe. In a letter to the Corps dated July 29, 2008, Mr. Martin wrote, "The design is defective." JX 279.  Referring to the use of dirty rock, he continued, "The cofferdam has not been rectified; the experiment to buy some time is already showing signs of [im]minent failure."  <u>Id.</u> (further stating that "[t]he rock installed at the toe of the defective cofferdam through your directive is only a temporary fix to the always present dangerous slip plane you mistakenly developed through your defective design").

In addition, Mr. Martin communicated to the Corps that he viewed the ongoing problems with the cofferdam as creating "a potential loss of life situation" and the Corps' "refusal to acknowledge" the problems as "increasing the chance of loss of life."  JX 279. Once Martin had raised the cofferdam to elevation 1830 (July 22, 2008), the next step in construction was to excavate the marina down to elevation 1790 and then use the dirt from the excavation to fill the abutments up to elevation 1855.  <u>See</u> DX 1, ACE16061, ¶ 1.2.6, ACE16062, ¶ 3.1, ACE16064, ¶ 3.5; Tr. 527 (Heuer); PX 128, ACE007907-09.  As Mr. Martin explained at trial, the south abutment was on the right-hand side; the north abutment was on the left-hand side; and the cofferdam was in between the two abutments.  Tr. 776.  To excavate the marina, men and equipment would be behind the cofferdam, so it needed to be safe.  Tr. 772, 776 (Martin).

The Corps responded on August 3, 2008, stating that "[t]he cofferdam was verified to be safe and is not in [im]minent danger of failure."  JX 290.  Again, on August 22, 2008, the Corps wrote, "[t]he cofferdam and north embankment as constructed are considered to be in a stable condition."  JX 333.  Accordingly, the Corps directed Martin to continue to construct the embankment and fill the north abutment in accordance with the contract drawings.  <u>Id.</u>; JX 353.

By September 4, 2008, the parties were at complete odds.  In another letter to Martin, the Corps indicated that it had conducted a stability analysis and reiterated that "[t]he previous safety determination of the cofferdam has not changed."  JX 364.  On that same day, Martin responded with the following:

The CENWO design engineers have tried 3 times now to justify the stability of the cofferdam and still have not got it right. . . . [I]t appears to me that the CENWO design engineers keep changing the cross-section, sheer strengths, and location-shape of the failure planes until they get a Factor of Safety that will justify the cofferdam stability, all without addressing the real problem.

In layman terms, the real problem is that there is very soft mud wave material landside of the current cofferdam embankment and north abutment. . . . [N]ear failures occurred during construction to-date, with escarpments and tension cracks occurring and re-occurring in both structures. The only thing that prevented total failure was the placement of a rock fill berm. . . . Thus, common sense and engineering judgment tells one that the current conditions are in a very precarious quasi-stable condition, even without slope stability analyses that are currently based on unknown and assumed conditions.

JX 369.

When Martin failed to proceed as directed based upon the above-mentioned concerns, the Corps threatened to terminate Martin's contract. On September 5, 2008, the Corps sent Martin a letter, in which it notified Martin that it may terminate the contract for default within ten days unless Martin began placing compacted fill material and provided a complete construction schedule. See JX 371. The letter also stated that Martin would have the opportunity to meet with the CO on September 10, 2008 to show cause why it should not be terminated. See id.

Despite the Corps' assertions to the contrary, the Court finds that Martin had good reason to delay between July 22 and September 5, 2008, as both Martin's consultant, Dr. Schwartz and the Corps' consultant, Terracon conducted analyses of the cofferdam and abutments and concluded that they were unstable.

Due to its safety concerns, Martin contacted Dr. Schwartz on August 11, 2008 and asked him to conduct an analysis and give his opinion on the current and continued stability of the cofferdam. Tr. 1126 (Schwartz). After reviewing the contract plans and specifications and inspecting the site on August 13 and 14, 2008, see Tr. 1124-26 (Schwartz), Dr. Schwartz concluded that the cofferdam had a "very low stability," Tr. 1159 (Schwartz). Dr. Schwartz calculated that the factor of safety for the underwater fill was 0.93. Tr. 1156 (Schwartz). According to both Dr. Schwartz and the Government's expert, Dr. Deutsch, anything less than one is unsafe and represents incipient failure. Tr. 572 (Deutsch), 1156, 1159 (Schwartz). Moreover, Dr. Schwartz calculated that the factor of safety for the overall cofferdam was only 1.04. Tr. 1159 (Schwartz).

Based upon his analysis, Dr. Schwartz sent a letter to the Corps on August 18, 2008, recommending that "marina excavation and embankment fill placements . . . be ceased near the cofferdam embankment and the north and south abutments until" the Corps could develop a safe and functional solution.   PX 128; see also Tr. 1169-70 (Schwartz).   The Corps sent Martin two letters, on August 22 and 29, 2008, directing Martin to fill west of the 1790 excavation line.   See JX 333, 353.   Dr. Schwartz maintained that it was unsafe to do so, Tr. 1171-72 (Schwartz), and noted that the cofferdam had cracked and moved again between his August and September inspections, Tr. 1176-77 (Schwartz).   Accordingly, on September 3, 2008, Dr. Schwartz sent a second letter to the Corps reiterating many of the concerns set forth in his August 18 letter and stating his expert opinion that Martin should not place fill as the Corps had directed.   See PX 130.

Despite the Corps' representations that the cofferdam was stable and safe, its own actions confirmed Dr. Schwartz's conclusions and served to cause further delays.   By August 1, 2008, the Corps had established a "no-cross line," directing that "no excavation will be performed to the west of the line shown on the attached drawing until the excavation to the east of the line is completed to elevation 1790."   JX 286; see also Tr. 820 (Martin).   Mr. Mailander testified that the Corps instituted the no-cross line, in part, so that Martin would not undermine the cofferdam, Tr. 224, and Mr. Matuska testified that the no-cross line would allow the cofferdam to strengthen and stabilize, Tr. 333. Although the Corps may have been wise to establish the no-cross line, its effect was to cause additional delays.   As Mr. Martin explained, before the Corps instituted the no-cross line, Martin could drive over the top of the cofferdam and the north abutment to haul away its waste.   Tr. 821.   After the establishment of the no-cross line, however, Martin "had to take virtually the longest route possible to start excavating out of the marina."   Id.

In addition, at the beginning of August, the Corps hired a third-party expert, Terracon Consultants, Inc. to assess the strength and stability of the cofferdam structure. Tr. 50, 61-62 (McCormick), 437 (Matuska), 846 (Martin), 1173 (Schwartz).   Defendant's witnesses maintained that the Corps hired Terracon only to appease Martin's concerns, see, e.g., Tr. 289-91 (Mailander), 437 (Matuska) (maintaining that "[the Corps] always felt that the cofferdam was stable" but that "to accommodate [Martin] . . . we contracted with Terracon to do this").   Regardless, the results of Terracon's analysis ultimately substantiated Martin's concerns and Dr. Schwartz's conclusions.   See PX 174.   As Dr. Schwartz noted, Terracon's report "confirmed that the stability was critical especially in the abutment areas."   Tr. 1179 (Schwartz).

In its final report, Terracon made a number of recommendations, including that the Corps:   (1) change the configuration and slope of the north and south abutments; (2) install and monitor piezometers to measure pore pressures on the north and south abutments; and (3) control the rate of fill on the abutments until pore pressures dissipated

and shear strength improved.  See PX 174; see also Tr. 1179 (Schwartz).  Importantly, the Terracon report indicated that these recommendations were necessary to ensure the appropriate level of safety.  See PX 174, ACE102633.  Terracon calculated that the factor of safety for the north abutment was only 1.0.  Id. at ACE102642.  Its report stated:

> Based on our analyses, revisions to design slope geometry are recommended for both of the abutments to produce an appropriate factor of safety.  These revisions involve adding a flat bench at elevation 1830 to raise the factor of safety against deep-seated slope instability to an acceptable level.

Id. at ACE102633.  Terracon also recommended that pore pressure PZs "be installed and monitored to establish pore pressure trends for at least several weeks before additional fill placement begins." Id. at ACE102634.  The conclusions of Dr. Schwartz and Terracon demonstrate that Martin was justified to have concerns about the stability of the cofferdam and north abutment during July and August, and any resultant delays during that time are excusable.

> ➢ *Suspension of work (September 10, 2008 – November 28, 2008)*

As directed in the Corps' show cause letter, Mr. Martin and Dr. Schwartz met with representatives of the Corps on September 10, 2008.  Tr. 61-62 (McCormick), 838, 846 (Martin), 1173 (Schwartz); see also JX 371.  During the meeting, Mr. Bertino asked Martin to fill the north and south abutments to elevation 1830 by November 1, 2008.  Tr. 845 (Martin).  Martin did so by September 30, 2008, and Mr. McCormick confirmed that Martin made very good progress during that time.  Tr. 156-57.  From September 30 until December 9, however, Mr. McCormick testified that Martin did not make good progress.  Tr. 153.  Defendant contends that this is the time period that counts to justify the Corps' termination for default.  Tr. Oral Arg. (Nov. 18, 2011); see also PP 1-2.  Defendant notes that as of September 2008, Mr. Martin conceded that he was driving 100 ton trucks across the cofferdam.  PP 4 (citing Tr. 934, 938 (Martin)).  In Defendant's view, this behavior shows that Martin deemed the cofferdam stable and no longer had a reason for excusable delay.  Tr. Oral Arg. (Nov. 18, 2011); PP 1.

There are two problems with Defendant's position.  First, the Corps' own actions and emails illustrate that the cofferdam was *not* stable as of September 2008.  Mr. Martin testified, and representatives of the Corps confirmed, that the Corps directed Martin not to raise the abutments beyond elevation 1830 until Terracon concluded its analysis.  Tr. 360 (Mailander), 484 (Matuska), 848 (Martin).  Mr. Martin testified that continuing to raise the abutments would have created slope failures.  Tr. 848.  Likewise, the Corps' own emails reveal that the Corps suspended work on the abutments due to concerns about their stability.  See PX 156; PX 163.  In an email on September 30, 2008, Corps employee, Brad Jones informed Corps personnel:

> Based on the independent geotechnical analysis performed the week of 15 September, there is concern with raising the south abutment above El. 1830.  We won't know if this is a real issue until the stability analysis is completed by Terracon. . . .  I am hopeful Martin will stop building the abutments once he reaches E. 1830 on his own, as he indicated was his plan to Terry Matuska last week.  This would give us time to complete the analysis and get a good read on the stability of the south abutment.

PX 153.

Additional emails indicate that the Corps remained concerned about the stability of the abutments through October and November 2008.  See PX 156; PX 166; PX 167.  For example, on November 19, Mr. Jones sent Corps personnel another email suggesting "the path forward for completing the north abutment."  PX 167.  He noted that "Terracon's concern is if the north abutment is built too rapidly, a failure may occur through this soft layer."  Id. at ACE005426.  "[T]o measure the effect on the soft layer during future fill placement," Mr. Jones explained that Terracon suggested installing PZs in both the north and south abutments.  Id.

Second, irrespective of whether the cofferdam and abutments were stable, the Corps occasioned most of the delays during the period between September 30, 2008 and November 28, 2008 by directing Martin to suspend work on the abutments.  Martin did not continue to fill the abutments to elevation 1855 as designed because the Corps directed Martin not to proceed past 1830 until Terracon concluded its analysis.  Tr. 360 (Mailander), 484 (Matuska).  Accordingly, Martin halted almost all fill placement and instead, continued excavating and placing riprap through December.  Tr. 817, 848, 854 (Martin).  Martin did not obtain authorization to proceed on the abutments until October 31 and November 28, 2008 when the Corps issued Modifications 17 and 18.  See PX 161; PX 173.

The Court finds that legitimate safety issues justified Martin's reluctance to excavate near the cofferdam and abutments, and to fill the abutments, according to the contract design from July through September 2008.  The Corps' defective design created the stability problems, and the Corps compounded the delays by failing to take responsibility and work with Martin to find a solution.  In addition, between September and November 2008, the Corps caused most of the delays by directing Martin to suspend work on the abutments until it issued Modifications 17 and 18.  Accordingly, the Court finds that the delays occasioned during this time are excusable.

2. Modifications

In addition to the Corps' defective design, Martin claims that the Corps' issuance of Modifications 17 and 18 is a source of excusable delay. The Corps did not provide additional time for performance to account for either of the contract modifications. See Tr. 255 (Mailander). The Government contends that the modifications did not entitle Martin to extra time because they actually reduced the amount of work Martin was to perform. (Def.'s Br. 34, Oct. 31, 2011) (citing Tr. 128 (McCormick) (testifying that the modifications reduced the quantity of material to be excavated)). The Government's contention misses the point. Irrespective of the contents of the modifications, the Corps prevented Martin from proceeding with work on the abutments between September 30 and October 31 and November 28, respectively, when Martin received Modifications 17 and 18. It is undisputed that the Corps directed Martin not to proceed with filling the abutments, see Tr. 484 (Matuska) ("[T]he contractor was not permitted to proceed with that work above 1830 until those recommendations of Terracon were incorporated into the modifications."), and each modification confirmed that Martin was to proceed only after issuance of the respective modification, see PX 161; PX 173.

Furthermore, although the modifications reduced the amount of material to be excavated, they redesigned the abutments, thereby changing the work to be performed. Modification 17 raised the excavation of the cofferdam from 1790 to 1800; adjusted the slope configuration of the south abutment; and added a 30 foot-wide berm at elevation 1830. See PX 161; Tr. 1179 (Schwartz). Modification 18 authorized similar changes to the north abutment, including a revised grading plan. See PX 173. Even the Government's witness reluctantly conceded that once the Corps issued the modifications, Martin required some measurable duration of time to construct the abutments as redesigned. See Tr. 130 (McCormick). As such, the Court finds that delays associated with the Corps' issuance of Modifications 17 and 18 are excusable.

3. Delays along the critical path

As a result of the Corps' defective design and subsequent modifications, Martin claims that it is entitled to a total extension of 241 days. See (Pl.'s Br. 65, 71, Sept. 23, 2011). To warrant a time extension, "the contractor must show that the excusable event caused a delay to the overall completion of the contract; i.e., the delays must have affected activities on the critical path." CJP Contractors, 45 Fed. Cl. at 372 (internal citations omitted). The "critical path" consists of work that "must be performed on schedule; otherwise, the entire project will be delayed." Sterling Millwrights, 26 Cl. Ct. at 75. "For every day that a critical path activity is delayed it delays the completion of the project one day." Tr. 1224 (Musser). If Martin was entitled to a time extension that would have placed the contract completion date beyond October 11, 2008, then the Corps' termination for "failure to meet the contractual completion date" would be wrongful. JX 674.

The parties both presented schedule delay experts, who agreed that critical path activities included:  dewatering the inside of the marina; excavating the inside of the marina; raising the cofferdam to elevation 1825; and filling the abutments to elevation 1855.   Tr. 507-09 (Heuer), 1223-24, 1246 (Musser); see also Tr. 376 (Mailander) (confirming that construction of the abutments above elevation 1830 was a critical path activity).

Martin's delay expert, Kurt Musser testified that by June 2008, difficulties with dewatering delayed the planned completion date to November 10, 2008, Tr. 1236, or approximately one month.   Defendant's delay expert, Kelly Heuer likewise calculated that delays in "marina dewatering" resulted in approximately a one-month delay (33 days).  See DX 156.  Specifically, Ms. Heuer attributed thirteen days to attempting to dewater with pumps; five days to identifying and approving use of the clay wedge; and fifteen days to placing the clay wedge.  See id.  Mr. Musser pointed out that the delays associated with dewatering were critical because when accounted for, they delayed construction into "the beginning of the adverse weather period."  Tr. 1236.

In addition, Ms. Heuer noted that just when Martin was about to finish raising the cofferdam to elevation 1825, the cofferdam began to move and slip.   DX 156, NC1000015-16.  According to Ms. Heuer, the slipping of the cofferdam and subsequent remedial work delayed construction fifteen days.  Id. at NC1000017.

Most significantly, Ms. Heuer determined that from July 23, 2008 until January 13, 2009, "[t]here were 144 days of critical delay to the marina excavation activities," including "the excavation of the marina basin and the construction of the marina embankments and abutments."  Id. at NC1000018-19.  She noted that during this time, "Martin often cited safety concerns arising from the alleged stability issues as the reasons for not proceeding with work in certain areas."  Id. at NC1000021.  She observed that as of January 7, 2009, "the areas requiring further excavation were mainly located near the cofferdam and North and South abutments."   Id. at NC1000020.  Finally, Ms. Heuer testified that Martin mitigated 37 days of delay by placing geotextile fabric and riprap concurrently with the marina excavation.  Id. at NC1000022-24.

As set forth in this opinion, the Court attributes most of the delays during the period between July 22, 2008 and January 13, 2009 to the Corps.[11]  In light of Martin's

---

[11] The Court notes that in Ms. Heuer's report, she ascribes responsibility for the delays, often attributing responsibility to Martin.  See PX 156.  While the Court finds her testimony instructive as to the project delays, it gives no weight to her determinations as to which party was responsible for those delays.  First, Ms. Heuer was qualified as an expert in schedule delay analysis.  See Tr. 500.  She conceded both that she does not have the background to offer an opinion on geotechnical issues and that it is up to the Court to make responsibility determinations.  Tr. 546 (Heuer).   Second, Ms. Heuer makes many of her responsibility determinations on the basis of Mr. Matuska's "expert report."  See PX 156 (footnotes).  The Court accords little weight to Mr. Matuska's report and the conclusions therein.  As the designer of the cofferdam, Mr. Matuska was not the person best-suited to evaluate the efficacy of the cofferdam's design.

legitimate concern with excavating near the cofferdam and north and south abutments, it makes sense that the excavation remaining would be in those areas.  Moreover, the fact that Martin continued placing geotextile fabric and riprap during that time, see Tr. 845, 854 (Martin); DX 156, NC1000022-24, confirms Mr. Martin's testimony that he wanted to complete the project and continued with what work he could do.

In light of the status of the critical path activities as of January 13, 2009, Ms. Heuer determined that the project completion date would be March 6, 2009.  DX 156, NC1000023.  Ms. Heuer did not account for winter weather delays, however.  See id.  As Plaintiff notes, by the time the Corps issued Modifications 17 and 18, on October 31 and November 28, respectively, construction season was all but over until the next spring.  See (Pl.'s Br. 69, 71, Sept. 23, 2011); see also Tr. 1174 (Schwartz) (testifying that by Halloween in the upper Midwest, earthwork is very tentative).  This Court has noted that "where excusable delays prolong a job into a season of unfavorable weather not anticipated under the original completion date, the extension given for such delays should take into consideration the foreseeable bad weather."  Wunschel & Small, Inc. v. United States, 1 Cl. Ct. 485, 490 (1982) (internal citations omitted).

As the contract completion date was originally scheduled for October 11, 2008, the parties did not account for weather delays in the winter of 2008-2009.  Nevertheless, the terms of the contract, as well as the evidence at trial, indicate that the parties foresaw bad weather and did not expect Martin to make much progress after November.  By the terms of the contract, the parties anticipated that Martin would be able to work only half of November and March and virtually not at all during December, January, and February.  See DX 1, ACE15869 (allotting twelve adverse weather days in November; twenty in December; twenty-three in January; eighteen in February; and twelve in March based on a five-day work week).  Mr. Mailander conceded that it is very difficult to work outdoors in North Dakota from December through February, Tr. 381, and Mr. McCormick noted that "in December in North Dakota it is very rarely above freezing," Tr. 64.  The winter of 2008-2009 was no different, as Ms. Heuer observed that it was a "very difficult" winter that year.  Tr. 512.

Accordingly, the record shows that the Corps did not anticipate Martin finishing the project until spring.  See PX 166; PX 167.  On November 19, 2008, Mr. Jones sent an email to Corps personnel in which he stated:

> I would like to get the PZs installed in December if we get a window of good weather . . . .

---

This is confirmed by the Government's concession that one of Mr. Matuska's primary conclusions—that the cofferdam design was not defective—is false.  Moreover, Mr. Matuska's report is only two pages long and provides no scientific analysis to support his conclusions.  For the same reasons the Court accords little weight to Mr. Matuska's report, the Court accords little weight to Ms. Heuer's responsibility determinations based upon that report.

. . . .

> . . . Need the field to weigh in on the likelihood of the contractor
> placing more fill on the abutments this winter.  In talking with
> Mark this afternoon, it sounds like that is unlikely until spring.

PX 167.  Mr. McCormick confirmed that by December 2008, the Corps did not expect Martin to make much progress due to the onset of winter weather.  Tr. 153.

Thus, while the Corps maintained that "[t]he severe winter weather experienced in North Dakota over the past several weeks was not a factor" in its determination to terminate the contract, JX 674, the Court concludes that it should have been.  Once the Corps delayed issuing its modifications until the end of October and November, it was unlikely that Martin would have been able to finish the project until spring, absent unusually pleasant weather.  As such, Martin was entitled to an extension to account for winter weather delays, and it was unreasonable for the Corps to terminate Martin's contract without taking winter weather delays into account.  When Mr. Musser accounted for the delays occasioned by Modifications 17 and 18, as well as winter weather delays, he calculated that the earliest adjusted contract completion date would have been June 4, 2009.  Tr. 1237, 1245-46 (Musser).

Using the most conservative estimates, the excusable delays along the critical path, coupled with winter weather delays, pushed the contract completion date beyond October 11, 2008 and well into the spring of 2009.  Accordingly, the Court finds that Martin was entitled to an extension beyond the October 11, 2008 deadline, and even beyond "its January 2009 projected completion," and that the Corps' termination for failure to meet the October 11 deadline "and any subsequent projected dates" was wrongful.  JX 674.  Because the Court finds that the Government's defective design and subsequent modifications were the controlling cause of the delays, Martin is entitled to have its termination for default converted into a termination for convenience.  See FAR 52.249-10(c); Axion Corp. v. United States, 75 Fed. Cl. 99, 117 (2007).

B.  Waiver

While the parties conceive of the case as involving two principal issues, the second (termination after waiver of default) is mooted by resolution of the first (excusability of Martin's default).  The Court finds the evidence overwhelming that the Corps' defective design, coupled with its subsequent directives and modifications, resulted in excusable delay, making it improper for the Corps to have terminated Martin's contract for default.  As such, the Court need not determine whether the Corps' actions constituted a constructive election to "waive" its right to terminate the contract for default.  Nonetheless, the following observations on the waiver issue are appropriate.

In addition to claiming excusable delay, Martin claims that the Corps waived the October 11, 2008 contract completion date and therefore, the Corps was wrong to terminate Martin's contract for failure to complete the project by that date.  See (Pl.'s Br. 51, Sept. 23, 2011).  In denying that it waived the October 11, 2008 contract completion date, Defendant rightly points out that the Court has applied the waiver defense in construction cases "only . . . when exceptional or rare circumstances are presented." (Def.'s Br. 13, Oct. 31, 2011) (quoting Indemnity Ins. Co. v. United States, 14 Cl. Ct. 219, 224 (1988)).  While acknowledging this high standard, the Court concludes that the Corps' conduct in this case may well present such exceptional circumstances.

The Corps threatened to terminate Martin's contract for default in a "show cause" letter dated September 5, 2008.  Prior to that time, Martin and the Corps had exchanged a slew of letters throughout July and August, 2008, in which the parties disagreed as to the stability and safety of the cofferdam and thus, Martin's ability or inability to continue with certain work on the cofferdam and abutments.  See JX 230; JX 232; JX 237; JX 241; JX 278; JX 279; PX 128; PX 130; JX 333; JX 353.  Their disagreements came to a head on September 5, 2008 when the Corps wrote:

> [Martin] will not meet the contract completion date of October 6, 2008. . . .  [T]he Government considers the refusal to place compacted fill material west of the excavation line . . . and the absence of a complete construction project schedule . . . to be conditions that are endangering performance of the contract before winter.  Therefore, unless this condition is cured in 10 days after receipt of this notice, the Government may terminate for default . . . .

JX 371.  In its letter, the Corps also gave Martin the opportunity to meet with the CO on September 10, 2008 to "show cause why this contract should not be terminated for default."  Id.  In addition, the Corps expressly reserved its rights, stating "it is not the intention of the [Corps] to condone any delinquency or to waive any rights . . . under the contract."  Id.

At the meeting on September 10, 2008, the parties appear to have reached an understanding.  The next letter from the Corps is an "abeyance letter" dated September 24, 2008, stating:

> Based on our conversation and your commitments regarding the south abutment and rip rap placement, I am satisfied that Martin Construction understands the progress that needs to be made to complete the project in a timely manner.  While I still consider Martin Construction to be delinquent in the performance of the contract, I am holding the contract termination in abeyance

> pending progress that is made on the south abutment and rip rap placement over the next ten days.
>
> . . . Since the contract is not being terminated so long as satisfactory progress continues, you should commit to rip rap processing.

JX 426. As previously noted, Martin interpreted "progress" to mean raising the abutments to elevation 1830, according to Mr. Bertino's instructions. See Tr. 845 (Martin). Martin completed that task on September 30, 2008. Id.

Thereafter, the abeyance period lapsed on October 4, 2008, and the contract completion date came and went on October 6, 2008,[12] without a word of protest from the Corps. In fact, the Corps did not mention the prospect of termination for default again until January 2009, just before the Corps actually terminated Martin's contract for default. See JX 673.

In the meantime, Martin submitted updated schedules on September 26, 2008, JX 430, and October 10, 2008, JX 456, showing a projected contract completion date of April 17, 2009. Nothing in the record indicates that the Corps objected to this projected completion date. To the contrary, the record demonstrates the Corps' understanding that Martin would not complete the project until spring. See Tr. 370-71 (Mailander) (testifying that "[w]ith the activities left . . . there was no way by November 19 that all this work would be done before sprin[g]"); see also PX 166; PX 167 (indicating that the Corps did not expect Martin to continue filling the abutments until spring). Nevertheless, the Corps never established a new contract completion date.

After Martin completed raising the abutments to elevation 1830 on September 30, 2008, the Corps directed Martin not to continue work on the abutments until the Corps received the results of Terracon's engineering analysis. See Tr. 360 (Mailander), 484 (Matuska). Although Martin proceeded with some riprap and excavation activities, see Tr. 845, 854 (Martin), it could not proceed with work on the abutments until the Corps issued Modifications 17 and 18 on October 31 and November 28, 2008, respectively, Tr. 484 (Matuska); see also PX 161; PX 173. Modification 18 noted that "[p]ending negotiations, a supplement will be issued to make final adjustment of price and time." PX 173. The Corps never issued a supplement to adjust the time. Instead, despite suspending work on the abutments for one- and two-month periods and issuing two modifications, which changed the configuration of each abutment, the Corps did not extend the contract completion date by a single day.

---

[12] At that point, the contract completion date was October 6, 2008 because the Corps had not yet issued the modification that ultimately extended the completion date to October 11, 2008. See DX 1, ACE09161.

In light of these facts, if ever there were exceptional circumstances justifying the application of the waiver defense in a construction contract case, this may very well be the case. The Corps wanted to have it both ways. While reserving its right to terminate for default,[13] the Corps' conduct suggested that it wanted Martin to continue performance. While maintaining that it did not waive the October 11, 2008 contract completion date, the Corps admits that it did not expect Martin to finish the project until December 2008. See Tr. 72-73 (McCormick). Mr. McCormick's testimony is illustrative of this duplicity:

> THE COURT: Mr. McCormick, you told me a few minutes ago that you thought the completion date as of early October I believe is some time in December?
>
> MCCORMICK: That's correct.
>
> THE COURT: But this letter refers to October 11th. Which is it?
>
>     . . . .
>
> MCCORMICK: Their contractual completion date was October 11th. Their response to our show cause notice showed them completing the project in December of 2008. . . . We did not modify the contract or incorporate that schedule into the contract, so it was not a contractual completion date.

Tr. 72-73. Mr. McCormick further testified that "[Martin's] realistic completion date was December of 2008," but that the Corps "never provided Martin a specific December date which became the contract completion date." Tr. 72-73.

The Corps cannot reserve default termination rights while also inducing the contractor to continue performance. As set forth in DeVito v. United States, 413 F.2d 1147, 1153 (Ct. Cl. 1969), "[w]here the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate." The Government's conduct indicates that after considering termination for default in September 2008, the

---

[13] The Court acknowledges that the Corps' reservation of rights and assessment of liquidated damages is a factor mitigating against waiver. See Abcon Assocs., Inc. v. United States, 44 Fed. Cl. 625, 629 (1999). Nevertheless, the Court does not find this factor dispositive of the waiver issue. If that were the case, by reserving its rights or assessing liquidated damages, the Government could "extend its period of forbearance in perpetuity" and essentially "eliminate the DeVito doctrine of waiver." Patten Co., ASBCA 35319, 89-3 BCA ¶ 21957 (citing Flintkote Co., GSBCA 4223, 76-2 BCA ¶ 12,031); see also "Waiver of the Right to Terminate for Default: The Impact of No-Waiver Language," 13 No. 12 Nash & Cibinic Rep. ¶ 64 (1999).

Government elected to permit Martin to continue performance and thus, relinquished its right to terminate for default.

By allowing the ten-day abeyance period to lapse without comment, the Corps indicated to Martin that it had made sufficient "progress" within the ten-day period, such that termination was no longer on the table. Moreover, by stating in the abeyance letter that "the contract is not being terminated so long as satisfactory progress continues," the Corps conveyed that failure to meet the October 2008 completion date was no longer a cause for termination. This conclusion is reinforced by the fact that the Corps allowed the contract completion date to pass without comment; did not object to Martin's proposed schedules showing a spring completion date; and did not mention the prospect of termination again until January 2009. Even by December 2008, when Mr. McCormick testified that relations between Martin and the Corps were "strained," he stated that he wanted "to find an orderly end to the contract without a termination for default and without a termination for convenience." Tr. 66-67. The Corps' conduct failed to put Martin on notice that the Corps was considering a termination for default.

Most telling, however, is the Corps' issuance of Modifications 17 and 18 in October and November 2008. Not only the very issuance—but the language used by the Corps in issuing the modifications—indicates that the Corps expected Martin to continue performance. Modification 18 expressly stated that the parties would negotiate "to make final adjustment of price and time." PX 173. That statement did not put Martin on notice that the Corps was considering termination. Moreover, the Corps knew the modification work would take some measurable time to complete, Tr. 130 (McCormick), and in fact, that Martin could not expect to complete much work with the onset of winter weather, Tr. 153 (McCormick). Nevertheless, the Corps issued the modifications without a revised contract completion date and had the temerity to assert that Martin was not entitled to additional time because the modifications decreased the scope of work. See (Def.'s Br. 334, Oct. 31, 2011); Tr. 128-30 (McCormick).

As previously noted, the Court need not definitively decide whether waiver applies here because the evidence is manifest that the Corps' defective design and subsequent actions caused excusable delay, such that termination of the contract on January 13, 2009 was improper. Nevertheless, the evidence strongly suggests that by its conduct, the Government exhibited a willingness to continue performance and thereby manifested its intent to waive the October 11, 2008 contract completion date.

## Conclusion

For the foregoing reasons, the Corps' termination of the contract for default was improper and shall be converted into a termination for convenience of the Government. As set forth in the Court's November 21, 2011 Order, the Court will consider the parties' opposing claims for damages in one consolidated action and in light of this opinion. The

Court will set a status conference with counsel of record within 30 days from the date of this opinion to establish a schedule of proceedings to resolve the remainder of this case.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge